AF Approval

Chief Approval

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA 2016 SEP 14 PM 4: 12
ORLANDO DIVISION

US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

UNITED STATES OF AMERICA

v.                                          CASE NO. 6:16-cr- 180 -ORL - 37GJK

JAMES LONG

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by A.

Lee Bentley, III, United States Attorney for the Middle District of Florida, and the

defendant, JAMES LONG, and the attorney for the defendant, A. Brian Phillips,

mutually agree as follows:

### A.   Particularized Terms

1.   Count Pleading To

The defendant shall enter a plea of guilty to Count One of the

Information. Count One charges the defendant with conspiracy to commit money

laundering, in violation of 18 U.S.C. § 1956(h).

2.   Maximum Penalties

Count One carries a maximum sentence of 20 years' imprisonment,

a fine of not more than $500,000, or twice the value of the property involved in

the transaction, whichever is greater, a term of supervised release of not more

than 3 years, and a special assessment of $100. With respect to certain

offenses, the Court shall order the defendant to make restitution to any victim of

Defendant's Initials

the offense, and with respect to other offenses, the Court may order the

defendant to make restitution to any victim of the offense, or to the community,

as set forth below.

    3.    Elements of the Offense

        The defendant acknowledges understanding the nature and

elements of the offense with which defendant has been charged and to which

defendant is pleading guilty.  The elements of Count One are:

> First:    Two or more people agreed to try to accomplish a
> common and unlawful plan to violate 18 U.S.C.
> § 1956, that is, money laundering by concealing the
> proceeds of specified unlawful activity or avoiding a
> transaction reporting requirement, or § 1957, that is,
> money laundering by knowingly engaging or
> attempting to engage in a monetary transaction
> involving the proceeds of specified unlawful activity;
> and
>
> Second:    The defendant knew about the plan's unlawful
> purpose and voluntarily joined in it.

    4.    Indictment Waiver

        Defendant will waive the right to be charged by way of indictment

before a federal grand jury.

    5.    No Further Charges

        If the Court accepts this plea agreement, the United States

Attorney's Office for the Middle District of Florida agrees not to charge defendant

with committing any other federal criminal offenses known to the United States

Attorney's Office at the time of the execution of this agreement, related to the

conduct giving rise to this plea agreement.

Defendant's Initials         2

6.    Mandatory Restitution to Victim of Offense of Conviction

Pursuant to 18 U.S.C. § 3663A(a) and (b), defendant agrees to make full restitution to any victim of the offense.

7.    Guidelines Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

8.    Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Defendant's Initials _____        3

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9.    Cooperation - Substantial Assistance to be Considered

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require.  If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial

Defendant's Initials _____                    4

assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

10.  Use of Information - Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

Defendant's Initials _____     5

11.    Cooperation - Responsibilities of Parties

a.    The government will make known to the Court and other
relevant authorities the nature and extent of defendant's cooperation and any
other mitigating circumstances indicative of the defendant's rehabilitative intent
by assuming the fundamental civic duty of reporting crime.  However, the
defendant understands that the government can make no representation that the
Court will impose a lesser sentence solely on account of, or in consideration of,
such cooperation.

b.    It is understood that should the defendant knowingly provide
incomplete or untruthful testimony, statements, or information pursuant to this
agreement, or should the defendant falsely implicate or incriminate any person,
or should the defendant fail to voluntarily and unreservedly disclose and provide
full, complete, truthful, and honest knowledge, information, and cooperation
regarding any of the matters noted herein, the following conditions shall apply:

(1)    The defendant may be prosecuted for any perjury or
false declarations, if any, committed while testifying pursuant to this agreement,
or for obstruction of justice.

(2)    The United States may prosecute the defendant for
the charges which are to be dismissed pursuant to this agreement, if any, and
may either seek reinstatement of or refile such charges and prosecute the
defendant thereon in the event such charges have been dismissed pursuant to
this agreement.  With regard to such charges, if any, which have been dismissed,

Defendant's Initials  _____                    6

the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)     The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)     The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

Defendant's Initials _____        7

(5)     The defendant will not be permitted to withdraw the

guilty pleas to those counts to which defendant hereby agrees to plead in the

instant case but, in that event, defendant will be entitled to the sentencing

limitations, if any, set forth in this plea agreement, with regard to those counts to

which the defendant has pled; or in the alternative, at the option of the United

States, the United States may move the Court to declare this entire plea

agreement null and void.

12.    Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately

and voluntarily any and all assets and property, or portions thereof, subject to

forfeiture, pursuant to 18 U.S.C. § 982(a)(1), whether in the possession or control

of the United States, the defendant or defendant's nominees.  The assets to be

forfeited specifically include, but are not limited to, the following:

- (1)     1690 Sawgrass Drive Southwest, Palm Bay, Florida, titled in the name of BMS Enterprises, LLC;

- (2)     784 Trinidad Avenue Southeast, Palm Bay, Florida, titled in the name of BMS Enterprises, LLC;

- (3)     2310 Wood Street, Melbourne, Florida, titled in the name of BMS Enterprises, LLC;

- (4)     742 Donau Avenue Northwest, Palm Bay, Florida, titled in the name of BMS Enterprises, LLC;

- (5)     765 Hall Road, Malabar, Florida, titled in the name of Brandy A. Long and JAMES T. LONG;

- (6)     117 Ridgemont Circle Southeast, Palm Bay, Florida, titled in the name of Brandy A. Long and JAMES T. LONG;

Defendant's Initials                  8

(7)    3740 Corey Road, Grant Valkaria, Florida, titled in the name of JAMES T. LONG and Brandy Long;

(8)    712 Norse Street Northwest, Palm Bay, Florida, titled in the name of JAMES T. LONG and Brandy Long;

(9)    2004 Chevrolet Silverado, VIN 1GCHC29U74E347751;

(10)   2013 Chevrolet Silverado, VIN 3GCPKSE79DG270209;

(11)   $10,140.00 in United States currency seized on or about June 14, 2014, from 765 Hall Road, Malabar, Florida;

(12)   Approximately $8,851.35 seized from SunTrust Signature Advantage Banking Account No. xxxxxxxxx1597, held in the name of James Long and Brandy Long;

(13)   Approximately $8,589.10 seized from Wells Fargo Crown Banking Account No. xxxxxxxxx2160, held in the name of James Long and Brandy Long;

(14)   Approximately $1,895.25 seized from Wells Fargo High Yield Savings Account No. xxxxxxxxx2157, held in the name of James Long and Brandy Long;

(15)   Approximately $3,099.40 seized from SunTrust Primary Business Checking Account No. xxxxxxxxx2355, held in the name of BMS Enterprises, LLC;

(16)   Jackson National Life Insurance, Non-Tax Qualified Policy, Policy No. 1009012598, held in the name of James Long, valued at approximately $83,333.43;

(17)   Jackson National Life Insurance Individual Retirement Annuity Policy No. 1009012628, held in the name of Brandy Long, valued at approximately $10,184.35; and

(18)   Jackson National Life Insurance Individual Retirement Annuity Policy No. 1009012636, held in the name of James Long, valued at approximately $10,334.44.

Defendant's Initials        9

The defendant, individually and as a managing member of BMS Enterprises, LLC, agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil judicial or administrative forfeiture action; with regard to items (9) through (18) above, the defendant hereby withdraws any claim he filed contesting the administrative forfeiture of the property. The defendant also hereby agrees to waive all constitutional, statutory and procedural challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The United States agrees that, in connection with the money laundering investigation giving rise to this prosecution, it will not seek the forfeiture of any property not specifically identified for forfeiture in this Plea Agreement.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to the provisions of Rule 32.2(b)(1)(A), the United States and the defendant request that promptly after accepting this Plea Agreement, the Court make a determination that the government has established the requisite nexus between the property subject to

Defendant's Initials _____    10

forfeiture and the offense to which defendant is pleading guilty and enter a preliminary order of forfeiture.  Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered.  In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to transfer custody of such property to the United States before the defendant's sentencing. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct.  The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States.  The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG §1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of his cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing.  In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Defendant's Initials _____          11

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this Plea Agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement.  The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including any agreed money judgment amount, is collected in full.

## B.    Standard Terms and Conditions

### 1.    Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to

Defendant's Initials _____          12

make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement.  The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (18 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.  On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013.  The special assessment is due on the date of sentencing.  To ensure that this obligation is satisfied, the Defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $100, payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing.  The defendant understands that this agreement imposes no limitation as to fine.

2.    Supervised Release

The defendant understands that the offense to which the defendant is pleading provides for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

Defendant's Initials _____        13

3.     Immigration Consequences of Pleading Guilty

The defendant  has been advised and understands that, upon
conviction, a defendant who is not a United States citizen may be removed from
the United States, denied citizenship, and denied admission to the United States
in the future.

4.     Sentencing Information

The United States reserves its right and obligation to report to the
Court and the United States Probation Office all information concerning the
background, character, and conduct of the defendant, to provide relevant factual
information, including the totality of the defendant's criminal activities, if any, not
limited to the count to which defendant pleads, to respond to comments made by
the defendant or defendant's counsel, and to correct any misstatements or
inaccuracies.  The United States further reserves its right to make any
recommendations it deems appropriate regarding the disposition of this case,
subject to any limitations set forth herein, if any.

5.     Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P.
32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States
Attorney's Office within 30 days of execution of this agreement an affidavit
reflecting the defendant's financial condition.  The defendant promises that his
financial statement and disclosures will be complete, accurate and truthful and
will include all assets in which he has any interest or over which the defendant

Defendant's Initials _____              14

exercises control, directly or indirectly, including those held by a spouse,
dependent, nominee or other third party. The defendant further agrees to
execute any documents requested by the United States needed to obtain from
any third parties any records of assets owned by the defendant, directly or
through a nominee, and, by the execution of this Plea Agreement, consents to
the release of the defendant's tax returns for the previous five years. The
defendant similarly agrees and authorizes the United States Attorney's Office to
provide to, and obtain from, the United States Probation Office, the financial
affidavit, any of the defendant's federal, state, and local tax returns, bank records
and any other financial information concerning the defendant, for the purpose of
making any recommendations to the Court and for collecting any assessments,
fines, restitution, or forfeiture ordered by the Court. The defendant expressly
authorizes the United States Attorney's Office to obtain current credit reports in
order to evaluate the defendant's ability to satisfy any financial obligation
imposed by the Court.

6.    Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor
bound by this agreement. The Court may accept or reject the agreement, or
defer a decision until it has had an opportunity to consider the presentence report
prepared by the United States Probation Office. The defendant understands and
acknowledges that, although the parties are permitted to make recommendations
and present arguments to the Court, the sentence will be determined solely by

Defendant's Initials  _____                    15

the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

       7.      Defendant's Waiver of Right to Appeal the Sentence

           The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by

Defendant's Initials _____      16

18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

        8.     Middle District of Florida Agreement

        It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

        9.     Filing of Agreement

        This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

        10.    Voluntariness

        The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind.  The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice

Defendant's Initials            17

received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11. Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are

Defendant's Initials _JJ_          18

true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

12.    Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13.    Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this ___14th___ day of ~~June~~, 2016.
September

A. LEE BENTLEY, III
United States Attorney

JAMES LONG
Defendant

Ilianys Rivera Miranda
Assistant United States Attorney

A. Brian Phillips
Attorney for Defendant

Katherine M. Ho
Assistant United States Attorney
Chief, Orlando Division

Defendant's Initials _____

19

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 6:16-cr-

JAMES LONG

### PERSONALIZATION OF ELEMENTS

First:          Did you and at least one other person agree to try to
                accomplish a common and unlawful plan to violate 18 U.S.C.
                §1956, that is to commit money laundering by concealing the
                proceeds of specified unlawful activity or avoiding a
                transaction reporting requirement, or to violate 18 U.S.C. §
                1957, that is, to commit money laundering by knowingly
                engaging or attempting to engage in a monetary transaction
                involving the proceeds of specified unlawful activity?

Second:        Did you know the plan's unlawful purpose and voluntarily join
               in it?

Defendant's Initials                     20

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 6:16-cr- 180 - ORL -37GJK

JAMES LONG

## FACTUAL BASIS

**The Specified Unlawful Activity**

The Drug Enforcement Administration (DEA), using a variety of investigative techniques, including surveillance, undercover officers posing as patients, and interviews with sources of information, and former employees, determined that, from in or about 2010, to on or about June 14, 2013, JAMES LONG (LONG) and others used the Professional Pain Center, located at 860 East State Road 434, Longwood, Seminole County, Florida (the clinic), to conspire to knowingly and intentionally distribute and dispense, and cause the distribution and dispensation of, controlled substances outside the usual course of professional practice and for no legitimate medical purpose, in exchange for monetary gain, primarily cash.

LONG, as president and owner of the clinic, employed approximately 10 physicians at the clinic who were willing to write unlawful and invalid prescriptions for Schedule II and Schedule III controlled substances that they issued outside the usual course of professional practice and for no legitimate medical purpose. Two of those physicians were Doctor-1 and Doctor-2.

Defendant's Initials _____                    21

A review of Doctor-1's Prescription Monitoring Program (PDMP), showed that between December 1, 2010 and December 1, 2011, Doctor-1 wrote approximately 19,685 prescriptions of controlled substances, for approximately 1,247 patients. The patients' ages ranged between 23 to 83 years old, with approximately 56% of the patients younger than 40 years of age and 23% younger than 30 years of age.

The 19,685 prescriptions accounted for approximately 1,538,282 dosage units of Schedule II medication, broken down as follows: 90 dosage units (D.U.) of Hydromorphone, 56 D.U. of Oxymorphone, 56 D.U. of Roxicodone, 325,248 of Oxycodone 15mg, and 1,212,832 of Oxycodone 30mg. The preferred Schedule II medication prescribed by Doctor-1 was Oxycodone, for a total of 1,538,080 D.U. or 12,698 prescriptions, accounting for 65% of the total Schedule II prescriptions. According to the PDMP, Doctor-1 expedited approximately 7,275 prescriptions for Oxycodone 30mg, making it the preferred strength, followed by 5,423 prescriptions of Oxycodone 15mg. The preferred Schedule IV medication was Alprazolam, which accounted for 5,755 prescriptions and/or 295,547 dosage units.

A medical expert, who is a board certified anesthesiologist licensed to practice medicine in Florida, after reviewing the breakdowns of controlled substances prescribed by Doctor-1, concluded that they were extraordinarily high and clearly excessive. In two different time periods (December 1, 2010 to December 1, 2011, and December 19, 2012 to June 11, 2013) Doctor-1

Defendant's Initials _____        22

prescribed 1.53 million and 1.55 million units, respectively, of immediate release Oxycodone, in addition to tens of thousands of other Schedule II controlled substances. Doctor-1 prescribed over 300,000 units of Schedule IV drugs in each of those years. According to the medical expert, no physician, in the usual course of his/her professional practice, could possibly prescribe this many units of controlled substances for legitimate medical reasons.

On or about April 24, 2012, the Florida Department of Health filed an Administrative Complaint before the Board of Medicine alleging that Doctor-2 had committed medical malpractice by failing to document a patient's medical record to justify simultaneous prescriptions of Oxycodone, Oxycontin, Soma, and Xanax. It was alleged that Doctor-2 had inappropriately or excessively prescribed Oxycodone, Oxycontin, Soma, and Xanax, in violation of Florida law.

Based on the Administrative Complaint, the Board of Medicine suspended Doctor-2's Florida Medical License and, on or about February 12, 2013, entered into a Stipulation Agreement with Doctor-2. Doctor-2 was ordered to pay a fine of $12,500 and attend two classes. The classes Doctor-2 had to attend were "Prescribing Controlled Drugs: Critical Issues and Common Pitfalls of Misprescribing" and "Quality Medical Records Keeping for Health Care Professionals." Doctor-2 was not allowed to treat patients for chronic and non-malignant pain, and he was not allowed to prescribe Schedule II and III controlled substances until he successfully completed the drug course.

Defendant's Initials _____        23

Between September 2011 and December of 2012, DEA agents and confidential sources conducted 19 undercover visits to the clinic, most of which were recorded using a covert audio/video device. During each of these undercover visits, patients waited for several hours at the clinic for a brief visit with the doctor; patients were often standing up along the wall in the waiting room because there was nowhere to sit as they waited to be seen by the doctor; clinic staff instructed patients to wait in the rear parking area so that it would not bring unwanted attention to the clinic; doctors would rarely conduct any type of physical or medical examination; and, on follow-up visits the doctor usually did not conduct any type of physical/medical examination. The investigation also revealed that the office staff falsified documents and ignored obvious signs of illegitimate MRIs.

One such undercover visit occurred on September 10, 2012, when CS-3 (a confidential source who has been corroborated extensively and is willing to testify) visited the clinic for a scheduled appointment with Doctor-1. CS-3 entered the clinic and provided Employee-1 (an employee of the clinic) with $200 for her appointment and an additional $100 in order to be placed ahead of other patients and to avoid having to provide a urine sample. Employee-1 accepted the money. After accepting the payment, Employee-1 immediately directed CS-3 to Doctor-1's waiting area and told the other patients in the waiting area not to worry. When CS-3 entered Doctor-1's office, he began to rub CS-3's back and shoulders. Doctor-1 then pulled CS-3 close to him and gave CS-3 a kiss on the

Defendant's Initials _____     24

side of the head. During the visit with Doctor-1, CS-3 and Doctor-1 engaged in general conversation about animals and a book CS-3 was reading. Doctor-1 told CS-3 that he used to be an eye surgeon, but had to stop and that was why he went into pain management. While CS-3 and Doctor-1 were talking, Doctor-1 flipped back and forth through CS-3's chart. During the visit, Doctor-1 did not ask CS-3 any medical questions, nor did he conduct any physical examination of CS-3. As soon as CS-3 exited Doctor-1's office, Employee-1 approached CS-3 and directed her outside. At that time, Employee-1 provided CS-3 with her prescription and said that there would be another person working as a receptionist at the clinic. Employee-1 instructed CS-3 to ensure that CS-3 contacted her (Employee-1) during CS-3's next appointment. The prescriptions that Employee-1 handed to CS-3 were for Oxycodone 168/30mg, Oxycodone 56/15 mg, Naproxen 56/500mg and Lorazepam 56/2mg.

On October 19, 2012, during another visit with Doctor-1, CS-3 and Doctor-1 discussed Doctor-1's military service. While CS-3 and Doctor-1 were talking, Doctor-1 flipped back and forth through CS-3's chart. Doctor-1 then asked CS-3 if they were real, referring to CS-3's breasts. While Doctor-1 and CS-3 were talking, Doctor-1 flipped back and forth through CS-3's chart. CS-3 started to walk out of Doctor-1's office and Doctor-1 asked her what she would be wearing next time. Doctor-1 then asked CS-3 for a hug and told CS-3, "Let's not tell anyone." As Doctor-1 hugged CS-3, he slapped CS-3 on her buttocks. While CS-3 was waiting for her prescriptions, Doctor-1 walked up to CS-3 and said that

Defendant's Initials _____ 25

he would see her next time. Doctor-1 then ran his figure down the front of CS-3's chest, in-between her breasts. During CS-3's visit, Doctor-1 did not conduct any type of physical examination on CS-3. After the visit, Doctor-1 provided CS-3 with four prescriptions. The prescriptions were for Oxycodone 168/30mg, Oxycodone 56/15mg, Naproxen 56/500mg and Lorazepam 56/2mg.

On November 16, 2012, CS-3 returned to the clinic for a scheduled appointment with Doctor-1. CS-3 approached Employee-1 and provided her with $200 for the visit and an additional $100 in order to be placed ahead of other patients and to avoid having to provide a urine sample. During CS-3's visit with Doctor-1, the two only engaged in a general conversation about Doctor-1's health. While CS-3 and Doctor-1 were talking, Doctor-1 flipped back and forth through CS-3's chart. During this visit, Doctor-1 did not conduct any type of physical examination on CS-3. After the visit Doctor-1, provided CS-3 with four prescriptions. The prescriptions were for Oxycodone 168/30mg, Oxycodone 56/15 mg, Naproxen 56/500mg, and Lorazepam 56/2mg.

The same medical expert reviewed video recordings of CS-3's meetings with Doctor-1, dated June 8, July 6, August 3, September 10, October 19, November 16, and December 21, 2012. The medical expert noted that as Doctor-1 was interacting with CS-3, at no time was a physical examination performed and the patient was not once questioned about her pain or activity levels. According to the expert, most of the time was spent with idle banter, discussing dogs, music, and Doctor-1's health. The expert also noted that there

Defendant's Initials _____     26

was no meaningful history-taking or discussion of the medical regimen prescribed.

On June 14, 2013, DEA agents executed a federal search warrant at the clinic and LONG's residence to obtain evidence corroborative of the illegal drug trafficking activities at the clinic. As a result of the execution of the warrant, the agents seized numerous patient files, 69 of which were randomly selected and reviewed by the same medical expert.

The patient files revealed that Doctor-1 and Doctor-2 alone prescribed these patients over 230,000 D.U. of Oxycodone, over 10,000 D.U. of Hydromorphone, over 44,000 D.U. of Alprazolam, over 35,000 D.U. of Carisoprodol, over 6,500 D.U. of Diazepam, over 3,500 D.U. of Lorazepam, over 1,500 D.U. of Clonazepam, over 600 D.U. of Percocet, over 350 D.U. of Zolpidem, over 150 D.U. of MS Cotin , and over 150 D.U. of Morphine Sulfate.

After reviewing all 69 patient files, the medical expert concluded that Doctor-1, Doctor-2, and at least three other doctors, engaged in a repeated pattern of issuing prescriptions for controlled substances without a legitimate medical reason, outside the usual course of professional practice. The medical expert also indicated that any reasonably prudent physician would not issue such prescriptions for controlled substances in the quantity and combinations prescribed because of the danger of overdose and death coupled with the likelihood of diversion. It was the medical expert's conclusion that the ongoing practice of the above mentioned physicians represented a clear and present

Defendant's Initials  .                27

danger to the health and welfare of the citizens of Florida, as the physicians were trafficking in controlled substances.

The evidence, therefore, shows that the clinic was operated in violation of Title 21, United States Code, Sections 841(a)(1) and 846, that is, as part of a conspiracy to distribute and dispense controlled substances, not for a legitimate medical purpose and not in the usual course of professional medical practice, which is a specified unlawful activity as defined by Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1), and all proceeds generated by the clinic in furtherance of the conspiracy constitute the proceeds of said specified unlawful activity.

## Conspiracy To Engage in Money Laundering

### *Cash Deposits*

The evidence establishes that virtually all clinic patients paid for office visits, for the purpose of obtaining prescriptions for controlled substances, with cash. A financial investigation covering the period of January 12, 2010 through January 8, 2013 revealed that LONG deposited excessive amounts of cash (proceeds of the trafficking of prescription drugs) into the clinic's operating account (Wells Fargo Account ending 8043) and his (and his wife's) personal bank accounts in lieu of the clinic's operating account. Notably, in contrast to that of a legitimate health care provider, the clinic's operating account did not receive a single payment from an insurance company. Instead, all of the approximately $5,570,260.00 in deposits were cash deposits.

Defendant's Initials                    28

In addition, the vast majority of the cash deposits into the clinic and personal accounts were structured to avoid the currency reporting requirements of the Bank Secrecy Act, 31 U.S.C. § 5313 and 31 C.F.R. § 1010.311, particularly the requirement that financial institutions file a Currency Transaction Report (CTR) for each deposit of more than $10,000 by, through or to such financial institutions.   To avoid the filing of a CTR, LONG and his co-conspirators would make multiple cash deposits on the same day in amounts less than $10,000, but with an aggregate value in excess of $10,000, in violation of 31 U.S.C. § 5324(a).  Between June 7, 2010 and December 17, 2012, there were 1,043 cash deposits into the clinic's operating account totaling approximately $5,570,260.  Approximately 80% of the deposits (843 cash deposits), totaling $4,049,832.01, were either deposited by the same individual, or multiple individuals, on the same day, and if aggregated would have exceeded $10,000. On the same day and/ or on consecutive days as cash was deposited into the clinic's operating account, approximately $657,357 in additional cash deposits were made into LONG's personal accounts.

The aforementioned practices demonstrate that LONG knew that the proceeds obtained through the operation of the clinic were proceeds obtained from an unlawful activity, specifically a conspiracy to distribute and dispense, and cause the distribution and dispensing of, controlled substances.  By depositing monies into his personal accounts in lieu of the clinic's operating account, and structuring such deposits (as well as the cash deposits into the operating

Defendant's Initials _____        29

account), LONG intended to conceal the source of the money obtained by illicit means and avoid the currency reporting requirements of the Bank Secrecy Act. Indeed, a legitimate business would first deposit proceeds obtained from its operation into its operating account, and not directly into the personal accounts of the operators of the business. In addition, as will be discussed below, to further conceal the nature, source and location of the proceeds obtained from the clinic, LONG and his co-conspirators commingled the proceeds obtained from the clinic with monies obtained from other companies – legitimate (J & L Masonry, Inc.) and legitimate on their face (Bones & Brew d/b/a Beef 'O' Brady's and BMS Enterprises, LLC) – in order to give legitimacy to the otherwise illegitimate funds.

Between 2010 and 2012, LONG and his wife drew approximately $1.7 million in salaries from the target clinic in addition to the $657,357 in cash deposits discussed above. In 2011 and 2012, they also received a total of $120,550 from BMS Enterprises LLC, Bones & Brew Inc., and J & L Masonry, Inc. While the $36,000 from J & L Masonry, Inc. is not tainted by any connection to the clinic or its illicit proceeds, the LONGs' investment in the other two companies is traceable to clinic proceeds. Therefore, any monies they obtained from Bones & Brew and BMS Enterprises, LLC are involved in their concealment money laundering.

### *Bones & Brew*

Between January 1, 2011 and July 28, 2011, there was $34,347.21 deposited into JP Morgan Chase Account #XXXXX9885 held by LONG. All of

Defendant's Initials _____    30

the funds deposited into this account during this time frame appear to be proceeds obtained from the operation of the clinic; specifically, the deposits were of payroll checks from the clinic to LONG ($20,544.90), his wife ($11,164.06) and another clinic employee ($2,638.25). On May 27, 2011, LONG wrote a $20,000 check from the account to "Kurt Lorenzini" to purchase an interest in Bones & Brew d/b/a Beef 'O" Brady's. The memo line of the check said "purchase of beers." Thereafter, on or about June 27, 2011, LONG and his wife began to receive payroll checks from Bones & Brew.

According to FLDSDC's records, Lorenzini was the owner of Bones & Brew until August 12, 2011, when he resigned as the President of the company. Subsequently, on October 5, 2011, LONG became the President and his wife became the Treasurer of the company. The funds LONG and his wife received from Bones & Brew are investment income and salary from actually working at the restaurant.

### BMS Enterprises

On March 28, 2011, LONG and his wife established BMS Enterprises, LLC and serve as its sole managing members. BMS Enterprises was established to manage several rental real estate properties purchased by LONG and his wife with proceeds obtained from or traceable to the illicit operation of the clinic. Specifically, all of the real property subject to forfeiture, except for the property located at 765 Hall Street, are rental properties managed by BMS Enterprises, LLC. Interestingly, even though BMS Enterprises has a business

Defendant's Initials _____          31

bank account at SunTrust Bank, LONG deposits rent checks into their personal accounts. The purchase of each of the rental properties involved monetary transactions knowingly conducted with more than $10,000 in criminal proceeds, in violation of 18 U.S.C. § 1957.

For instance, JP Morgan Chase, NA Savings Account #XXXXXX7996 held in the name of LONG was opened on August 18, 2010 with a $500.00 cash deposit. LONG was the only signature authority on the account. From August 19, 2010 through December 31, 2010, approximately $130,789.26 was deposited into this account. All but $50 of the deposits are directly traceable to the clinic. LONG deposited 10 payroll checks from the clinic, totaling $29,239.26, as well as approximately $101,000 in clinic proceeds through 21 cash deposits.

From January 1, 2011 until July 13, 2011, when NA Savings Account #XXXXXX7996 was closed, approximately $172,285.71 was deposited into this account. LONG deposited 22 payroll checks from the clinic, totaling $71,287.71, as well as $98,600 in clinic proceeds through 22 cash deposits. The only deposits not related to the clinic were 7 checks from J & L Masonry totaling $2,398.00.

In 2011, LONG and his wife purchased the real properties located at 742 Donau NW, Palm Bay, FL, 1690 Sawgrass Drive SW, Palm Bay, FL, and 117 Circle SE, Palm Bay, FL with funds from NA Savings Account #XXXXXX7996.

On January 18, 2011, LONG signed a contract to purchase 117 Circle SE, Palm Bay, Florida for $164,000. The closing was conducted by Peninsula Title

Defendant's Initials _____     32

Services, LLC on January 31, 2011. On January 29, 2011, LONG obtained a cashier's check in the amount of $79,432.08 from NA Savings Account #XXXXXX7996. On January 29, 2011, LONG's wife obtained a cashier's check in the amount of $80,000 from Wachovia Bank Account #XXXXXXXXX2157 held jointly by the LONGs, which was also funded with clinic proceeds. Both checks, which totaled $159,432.08, were used to complete the purchase of this property.

On March 25, 2011, the LONGs signed a contract to purchase 742 Donau Avenue NW, Palm Bay, Florida for $45,000.00. On March 31, 2011, LONG wire transferred $43,433.69 from NA Savings Account #XXXXXX7996 to Peer Title in order to complete the purchase of this property. The property was titled in the name of BMS Enterprises, LLC.

On May 25, 2011, LONG and his wife signed a contract to purchase 1690 Sawgrass Drive SW, Palm Bay, Florida for $115,000. On June 29, 2011, JAMES obtained a cashier's check in the amount of $112,673.83 made payable to Alliance Title Insurance Agency from NA Savings Account #XXXXXX7996 in order to complete the purchase of this property. On October 26, 2011, a Quit Claim Warranty Deed was filed transferring this property from the LONGs to BMS Enterprises, LLC.

Also on October 26, 2011, a Quick Claim Warranty Deed was filed transferring the 117 Circle SE property from LONG to LONG and his wife. They lived in this property until they purchased the property located at 765 Hall Road.

Defendant's Initials _____                    33

In sum, LONG and his conspirators conducted financial transactions, which affected interstate commerce, involving the proceeds of a specified unlawful activity. The following assets were obtained directly from or are traceable to the unlawful operation of the clinic, and are subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1) as alleged in the Information as property involved in the money laundering conspiracy:

1. 1690 Sawgrass Drive Southwest, Palm Bay, Florida, titled in the name of BMS Enterprises, LLC;

2. 784 Trinidad Avenue Southeast, Palm Bay, Florida, titled in the name of BMS Enterprises, LLC;

3. 2310 Wood Street, Melbourne, Florida, titled in the name of BMS Enterprises, LLC;

4. 742 Donau Avenue Northwest, Palm Bay, Florida, titled in the name of BMS Enterprises, LLC;

5. 765 Hall Road, Malabar, Florida, titled in the name of Brandy A. Long and JAMES T. LONG;

6. 117 Ridgemont Circle Southeast, Palm Bay, Florida, titled in the name of Brandy A. Long and JAMES T. LONG;

7. 3740 Corey Road, Grant Valkaria, Florida, titled in the name of JAMES T. LONG and Brandy Long;

8. 712 Norse Street Northwest, Palm Bay, Florida, titled in the name of JAMES T. LONG and Brandy Long;

9. 2004 Chevrolet Silverado, VIN 1GCHC29U74E347751;

10. 2013 Chevrolet Silverado, VIN 3GCPKSE79DG270209;

11. $10,140.00 in United States currency seized on or about June 14, 2014, from 765 Hall Road, Malabar, Florida;

Defendant's Initials                 34

12. Approximately $8,851.35 seized from SunTrust Signature Advantage Banking Account No. xxxxxxxxx1597, held in the name of James Long and Brandy Long;

13. Approximately $8,589.10 seized from Wells Fargo Crown Banking Account No. xxxxxxxxx2160, held in the name of James Long and Brandy Long;

14. Approximately $1,895.25 seized from Wells Fargo High Yield Savings Account No. xxxxxxxxx2157, held in the name of James Long and Brandy Long;

15. Approximately $3,099.40 seized from SunTrust Primary Business Checking Account No. xxxxxxxxx2355, held in the name of BMS Enterprises, LLC;

16. Jackson National Life Insurance, Non-Tax Qualified Policy, Policy No. 1009012598, held in the name of James Long, valued at approximately $83,333.43;

17. Jackson National Life Insurance Individual Retirement Annuity Policy No. 1009012628, held in the name of Brandy Long, valued at approximately $10,184.35; and

18. Jackson National Life Insurance Individual Retirement Annuity Policy No. 1009012636, held in the name of James Long, valued at approximately $10,334.44.

Defendant's Initials                 35