```
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                     ORLANDO DIVISION
                    Case No. 6:16-cr-180
 3
    . . . . . . . . . . . . . . . .
 4  UNITED STATES OF AMERICA,    :
                                 :
 5          Plaintiff,           :        Orlando, Florida
                                 :        February 2, 2017
 6               v.              :        9:31 a.m.
                                 :
 7  JAMES LONG,                  :
                                 :
 8          Defendant.           :
    . . . . . . . . . . . . . . . .
 9


10

           TRANSCRIPT OF SENTENCING HEARING, VOLUME II
11          BEFORE THE HONORABLE ROY B. DALTON, JR.
                  UNITED STATES DISTRICT JUDGE
12

13  APPEARANCES:

14

15  Counsel for Plaintiff:      Ilianys Rivera Miranda

16

17  Counsel for Defendant:      A. Brian Phillips

18

19

20

21  Court Reporter:    Amie R. First, RDR, CRR, CRC, CPE
                       Federal Official Court Reporter
22                     401 West Central Boulevard, Suite 4600
                       Orlando, Florida  32801
23                     AmieFirst.CourtReporter@gmail.com

24  Proceedings recorded by mechanical stenography.

25  Transcript produced by Computer-Aided Transcription.
```

1

<u>**INDEX OF PROCEEDINGS**</u>

2

3

<u>**GOVERNMENT WITNESS**</u>

4

<u>**D I R E C T   C R O S S   R E D I R E C T   R E C R O S S**</u>

5

Keith Whitmore                                      6        25        32

6

7

<u>**ARGUMENT**</u>

8

By Ms. Rivera Miranda ....................  34

9

By Mr. Phillips ..........................  39

10

11

Defendant's Allocution  .................  42

12

Imposition of Sentence  .................  47

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S

 2                       * * * * *

 3           THE DEPUTY CLERK:  Case Number

 4   6:16-cr-180-ORL-37GJK, United States of America versus

 5   James Long.

 6           Counsel, please state your appearance for the

 7   record.

 8           MS. RIVERA MIRANDA:  Good morning, Your Honor.  On

 9   behalf of the Government, Assistant United States Attorney

10   Ilianys Rivera.  Here with me is Nicole Andrejko.

11           We're ready to proceed.

12           As well as Agent Keith Whitmore.  He's also with

13   us.  And Special Agent Raul Roque.

14           THE COURT:  All right.  Good morning.

15           MR. PHILLIPS:  Good morning, Your Honor.  Brian

16   Phillips on behalf of the defendant, James Long, who is

17   present in the courtroom seated to my immediate right.

18           I would also note the presence of his spouse,

19   Brandy Long, in the back of the courtroom in the gallery.

20           THE COURT:  All right.  Good morning,

21   Mr. Phillips, Mr. Long.

22           I note Mr. Salce is here from the United States

23   Probation Office.  Thank you for your work on this case.

24           Mr. Long, on October the 11th of 2016, you

25   entered a guilty plea to count one of an information that
```

1    charged you with engaging in a conspiracy to commit money

2    laundering, a violation of Title 18 of the United States

3    Code, Section 1956.

4          The Court accepted your plea of guilty and

5    adjudicated you guilty of that offense.

6          Mr. Phillips, have you had an opportunity to go

7    through the presentence report with your client?

8          MR. PHILLIPS:  I have, Your Honor.

9          THE COURT:  Are there any unresolved objections to

10   either the facts or the computation of the guidelines?

11         MR. PHILLIPS:  There are not, Your Honor.

12         THE COURT:  Thank you.

13         And, Ms. Rivera, from the Government's

14   perspective, any unresolved issues with respect to the PSR?

15         MS. RIVERA MIRANDA:  No, Your Honor.

16         THE COURT:  All right.  Thank you then.

17         In the absence of any objections, I'm going to

18   adopt the factual statements and guideline calculations

19   that are contained in the presentence report.

20         Those result in the Court findings of fact as

21   follows:  A total offense level of 43; criminal history

22   category of I; Mr. Long, that results in a guideline range

23   of imprisonment of 240 months as a result of the 20-year

24   statutory maximum; a range of supervised release ranging

25   from 1 to 3 years.

1          Restitution is not being sought; is that correct?

2          MS. RIVERA MIRANDA:  That's correct, Your Honor.

3          THE COURT:  Fine ranging from $25,000 to

4    $11,140,520; and a $100 special assessment.

5          Are there any victims that the Government is aware

6    of that want to address the Court prior to the imposition

7    of sentence?

8          MS. RIVERA MIRANDA:  No, Your Honor.

9          THE COURT:  Ms. Rivera, would you like to be heard

10   on an appropriate sentence for Mr. Long?

11         MS. RIVERA MIRANDA:  Yes, Your Honor.

12         What we intend to do briefly, we would like to

13   call Agent Whitmore just to give the Court some context and

14   background about the case and some additional information

15   regarding the defendant's role.

16         THE COURT:  Okay.  While the agent is coming

17   forward to be sworn, I'll just note for the record that I

18   did have an opportunity to not only review the presentence

19   report, but I also reviewed some other material that was

20   submitted in conjunction with the report, some of the

21   objections.  I also reviewed the sentencing memorandum

22   submitted by Mr. Phillips.  And I think that's it.

23         Are you are of anything else I should have

24   reviewed, Mr. Phillips?

25         MR. PHILLIPS:  No, Your Honor.  I think that

```
 1   covers the record in the matter.
 2          If I recall the Court's observations from our last
 3   hearing about the necessity for greater context, and I
 4   think that's what we're about to receive.
 5          THE COURT:  Okay.  Great.
 6          All right.  Special Agent, if you'll raise your
 7   hand to be sworn, please.
 8          (Witness sworn.)
 9          THE DEPUTY CLERK:  Please take the witness stand.
10          Please state your name and spell your last name.
11          THE WITNESS:  Keith Charles Whitmore,
12   W-H-I-T-M-O-R-E.
13          THE COURT:  You may inquire.
14          MS. RIVERA MIRANDA:  May it please the Court.
15          Thank you.
16                      DIRECT EXAMINATION
17   BY MS. RIVERA MIRANDA:
18   Q    Sir, where are you currently employed?
19   A    Winter Springs Police Department.
20   Q    In what capacity are you employed with --
21   A    As a patrol officer.
22   Q    Okay.  So how long have you worked with the
23   department?
24   A    Fifteen years.
25   Q    And let me ask you as well, as you worked with the
```

```
1    Winter Springs Police Department, did you also work with

2    Seminole County Sheriff's Office?

3    A    Yes, ma'am.

4    Q    In what capacity?

5    A    I was an investigator assigned to the City County

6    Investigative Bureau.

7    Q    And what were your duties then?

8              THE COURT:  Can I stop you for a second?

9              Officer, could you turn that microphone, pull that

10   microphone toward you a little bit and speak directly into

11   it.  Thank you.

12   BY MS. RIVERA MIRANDA:

13   Q    What were your duties with the City County

14   Investigative Bureau?

15   A    I was involved with investigating individuals doing

16   street-level narcotics, drug trafficking, and vice crimes.

17   Q    Okay.  At any point were you transferred to the

18   pharmaceutical diversion unit?

19   A    Yes, ma'am.

20   Q    And what were your duties then?

21   A    In that unit, we're also investigating individuals

22   that were doing their controlled substances and also

23   individuals that were doctor shopping.

24   Q    Okay.  And can you explain what is doctor shopping?

25   A    Doctor shopping is when an individual sees multiple
```

1    doctors within a 30-day time period and withholds that

2    information from the doctor.

3    Q    And they're seeing doctors, multiple doctors for what

4    purpose?

5    A    They're obtaining the same prescription or the same

6    therapeutic use.  So if an individual is obtaining

7    Oxycodone, they also might be obtaining Hydrocodone because

8    it's used for the same thing.

9    Q    So you were investigating individuals for doctor

10   shopping.  Were you also involved in the investigation of

11   individuals sponsoring?

12   A    Yes, ma'am.

13   Q    What is sponsoring?

14   A    Sponsoring is when an individual takes either a family

15   member or somebody that is addicted to narcotics to a pain

16   clinic to obtain controlled substances for the drug

17   trafficking organization.

18        That individual either pays for the full prescription,

19   pays for the doctor's visits; and in return gets part of

20   the prescription or the whole prescription return.

21        If it's a family member, nine times out of ten they

22   are just giving the family member money to obtain the

23   prescriptions for the drug trafficking organization.

24   Q    And do you know this based on your experience as a law

25   enforcement officer?

```
1    A     Yes, ma'am.

2    Q     Did you ever work with the Drug Enforcement

3    Administration?

4    A     Yes, ma'am.

5    Q     In what capacity?

6    A     I was a task force officer assigned to the task force

7    diversion unit.

8    Q     When specifically were you assigned to the D.E.A.?

9    A     From July of 2011 until August of 2016.

10   Q     And what were your duties within the D.E.A.?

11   A     Our duties were to, to investigate individuals that

12   were diverting their pills, either being sponsored, doctor

13   shopping, pain management clinics, or pharmacies that were

14   acting outside the medical scope.

15   Q     Okay.  Now, do you know the defendant in this case?

16   A     Yes, ma'am.

17   Q     And how do you know him?

18   A     I know the defendant through the course of my

19   investigation.

20   Q     Okay.  What was the nature of your investigation?

21   A     My investigation --

22   Q     In this case.

23   A     My investigation in this case was investigating

24   Professional Pain Center as a -- that was operating as a

25   pain mill, pill mill.
```

```
1    Q    And at the time when you initiated your investigation,
2    what was the relationship of the defendant to the pain
3    clinic?
4    A    The defendant was the owner of the Professional Pain
5    Center.
6    Q    Okay.  And if you see the defendant here in court
7    today, could you please identify him.
8    A    He's sitting at the table next to Mr. Phillips.
9         MS. RIVERA MIRANDA:  Your Honor, may the record
10   reflect that the witness has identified the defendant?
11        THE COURT:  Yes.
12   BY MS. RIVERA MIRANDA:
13   Q    And you mentioned that you were investigating
14   Professional Pain Center in relationship to the possibility
15   of it being run as a pill mill; is that correct?
16   A    Yes, ma'am.
17   Q    What is a pill mill?
18   A    A pill mill is a -- it's a healthcare facility that
19   operates all on cash business.  They do not take insurance.
20   Their employees and doctors conspire to trafficking
21   controlled substances.
22   Q    Okay.  So basically they are acting outside the course
23   of professional practice?
24   A    Yes, ma'am.
25   Q    And let me ask you in particular, when did this
```

```
 1   investigation begin?

 2   A    July -- January of 2011.

 3   Q    Okay.  And who opened the investigation?

 4   A    I opened the investigation while I was assigned to the

 5   Seminole County Sheriff's Office.

 6   Q    And can you please explain to the Court, why did you

 7   open the investigation?

 8   A    I opened the investigation.  We received complaints

 9   that the doctors at the Professional Pain Center were

10   prescribing large quantities of controlled substances.

11       Also, there was a lot of individuals that we were

12   investigating that were doctor shopping, and they were

13   being seen at the Professional Pain Center.

14   Q    Okay.

15   A    Also, you know, when I went there initially, we met

16   with the office manager, and he was high on some type of

17   controlled substance.

18   Q    That's what you noticed personally?

19   A    Yes, ma'am.

20   Q    And who was that individual that you first saw at the

21   Pain Center?  You mentioned the operating manager at the

22   time.

23   A    Daniel Bogan.

24   Q    Okay.  In addition to that, before you opened the

25   investigation, did you have any information regarding the
```

```
1    defendant associated with a pain center in Georgia?

2    A    Yes, ma'am.

3    Q    What is that information?

4    A    The information received that the defendant was

5    opening a pain clinic, a Professional Pain Center in

6    Savannah, Georgia.

7         However, it was shut down the first day it opened due

8    to the attending physician not being licensed in the state

9    of Georgia by the Chatham County Sheriff's Office.

10   Q    Okay.  So you have some information that led you to

11   believe this may be a pill mill.

12        Can you please explain to the Court how did you

13   develop your investigation?

14   A    Through surveillance, confidential informants, sources

15   of information, and undercover doctor visits at the

16   Professional Pain Center using confidential sources and

17   undercover agents for a span of one year.

18   Q    Now, let me ask you, did you also conduct a financial

19   investigation in this case that spanned about three years?

20   A    Yes, ma'am.

21   Q    And in addition to that, did you have any opportunity

22   to have an expert review patient files --

23   A    Yes, ma'am.

24   Q    Let me ask you, regarding the undercover visits to the

25   pain clinic, were these visits recorded?
```

```
1    A    Yes, ma'am.

2    Q    And in addition to that, these confidential sources,

3    individuals that were interviewed in connection with the

4    investigation, are you aware, they are willing to testify

5    in this case?

6    A    Yes, ma'am.

7    Q    What did you determine based on this initial

8    investigation?

9    A    Based on the initial investigation, we determined that

10   the Professional Pain Center was acting outside the medical

11   scope of professional practice and was a pill mill.

12   Q    How so?  What was the basis of that conclusion?

13   A    Patients in the parking lot sitting in vehicles.  Out

14   of state tags.  Patients coming from all over the state of

15   Florida and also coming from outside of the state to obtain

16   prescriptions from the Professional Pain Center.

17   Q    Did you have any information regarding any of the

18   doctors having sexual encounters with patients at the

19   clinic?

20   A    We also received information that other doctors that

21   were -- one of the doctors at the clinic was having sexual

22   relations with the patients.

23   Q    Do we actually have witnesses that would be willing to

24   testify to that effect?

25   A    Yes, ma'am.
```

1   Q     In addition to that, did you -- do we have information

2   regarding a drug trafficking organization out of

3   Titusville?

4   A     Yes.  There was a drug trafficking organization out of

5   Titusville that were sponsoring individuals who were going

6   to the Professional Pain Center.

7         And this organization was also tipping the staff to

8   get their patients in faster to be seen by the doctors.

9   Q     Okay.  Now, in addition to that, regarding one of the

10  doctors, and Dr. 2 in the plea agreement, did you learn

11  anything through your investigation as to whether his

12  license at any point was suspended?

13  A     Yes.  Dr. 2's license was suspended by the state of

14  Florida for overprescribing.

15  Q     And this happened during the scope of the conspiracy?

16  A     Yes, ma'am.

17  Q     Okay.  And during that time, according to the

18  investigation, who was responsible for operating the

19  clinic?  Who was the owner of the clinic?

20  A     The defendant.

21  Q     And did you learn through your investigation, at what

22  point did he cease to be the owner or if there was any

23  transfer of authority in the clinic?

24  A     In the beginning of 2011, when the state of Florida's

25  laws changed that the pain clinics had to be owned by

```
1   doctors.

2   Q     Then who became the doctor?

3   A     Dr. 1.

4   Q     Okay.  He became the president?

5   A     Yes.

6   Q     And what was -- after Dr. 1 became the president of

7   the clinic in 2011, what was the defendant's role in the

8   clinic --

9   A     The defendant's role was still the owner of the

10  clinic.  Dr. 1 was only the owner of the clinic to satisfy

11  the laws required by the state of Florida.

12        The defendant still had -- still signature authority

13  on all the banking, on the operating account, and signed

14  all the checks, for the paychecks for the employees.

15  Q     And you learned this through your financial

16  investigation?

17  A     Yes, ma'am.

18  Q     And let me ask you as well, did this business, the

19  Pain Center, did it accept any insurance payments at any --

20  A     No, ma'am.

21  Q     Okay.  And based on your knowledge of the financial

22  aspect of this case, is this a cash-only business pretty

23  much?

24  A     Yes, ma'am.

25  Q     Okay.  When in your investigation did you learn about
```

1    Long's association with the pain clinic?

2    A    I initially learned about the defendant's process

3    right at the beginning by running corporation paperwork

4    through the Division of Corporations, identifying him as

5    the president of the Professional Pain Center along with

6    Daniel Bogan being the vice president.

7    Q    And when did this happen?  When was the Professional

8    Pain Center incorporated, if you're aware of?

9    A    In -- I believe it was October of 2009.

10   Q    During the span of the conspiracy, did you assess

11   about how much money did the defendant make based on the

12   operation of these clinics?

13   A    $5.5 million.

14   Q    Okay.

15   A    Went through the operation account of the clinic.

16   Q    Okay.  So can you explain to the Court what you

17   learned through your financial -- through the financial

18   investigation as to how that money was being deposited?

19   A    We learned through the investigation that the

20   defendant and Daniel Bogan deposited 843 deposits in

21   multiple deposits throughout the day to stay under the

22   $10,000 requirements per the financial requirements.

23        And with those proceeds, with those cash deposits, the

24   defendant was then transferring or depositing cash proceeds

25   into his personal accounts which he later used to purchase

```
1    residential properties in Brevard County.

2    Q    Are those properties listed in a forfeiture provision

3    of the plea agreement?

4    A    Yes, ma'am.

5    Q    Did he also commingle these funds with other

6    investments in other properties?

7    A    Yes, ma'am.  The defendant used cash proceeds from the

8    operating account to purchase Bones & Brew, which is

9    actually known as Beef 'O' Brady's in Palm Bay.

10   Q    Okay.  Are you also aware whether, in or about

11   March 28th, 2011, the defendant and his wife

12   established a BMS Enterprises?

13   A    Yes.  They started an LLC corporation to manage their

14   residential properties that they were renting out.

15   Q    And all of these properties, do you know what the

16   source of the money was to buy those properties?

17   A    The source of the proceeds to buy those properties

18   came from the pain clinic.

19   Q    Now, you said that they were pretty much making cash

20   deposits, different amounts of deposits, same day?

21   A    Yes, ma'am.

22   Q    Were any of these recorded like as far as complying

23   with the CTRs?

24   A    No, ma'am.

25   Q    Okay.  And let me ask you, what happened on or about
```

1    June 14, 2013?

2    A    We executed a search warrant at the Professional Pain

3    Center along with the defendant's residence.

4    Q    And let me ask you, what evidence did you obtain as a

5    result of the execution of the warrant?

6    A    We obtained all the patient files from the clinic and

7    I believe $10,000 from the residence.

8    Q    Okay.  Now, these patient files, what happened with

9    them?

10   A    Sixty-nine files were reviewed by two medical experts.

11   Q    And do you know -- based on the review, what was your

12   conclusion as to the operation of the Pain Center?

13   A    The experts determined that the Professional Pain

14   Center was acting outside the medical scope of a

15   professional practice, and the employees and doctors were

16   conspiring to trafficking controlled substances.

17   Q    Okay.  Now, let me ask you as well, after the

18   execution of the warrant, did you have an opportunity to

19   interview Mr. Bogan?

20   A    Yes, ma'am.

21   Q    And the defendant as well?

22   A    Yes, ma'am.

23   Q    As well as other employees.  Would that be correct?

24   A    Yes, ma'am.

25   Q    Can you please inform the Court as to what did Bogan

```
 1   say -- and let me clarify here.  Bogan has been interviewed

 2   by the Government and has been cooperating with the

 3   Government.

 4        Is that correct?

 5   A    Yes, ma'am.

 6   Q    What did Mr. Bogan say regarding his role and that of

 7   Mr. Long as it pertains to the clinic?

 8   A    Mr. Bogan advised us that he was long-time friends

 9   with the defendant.  He actually worked for the defendant

10   in his masonry business.  That they were both traveling to

11   South Florida and obtaining prescriptions from pain clinics

12   down there and then selling them in Brevard County.

13   Q    Let me ask you a question.  You said he was a

14   long-time friend of Mr. Long.  And you identified a

15   business.  What was that business?

16   A    That was J&L Masonry.

17   Q    And who was the president or owner of that business?

18   A    The defendant.

19   Q    And let me ask you, this was prior to this business

20   venture here, the Pain Center, prior to initiating or

21   creating a pain center?  It was working in the construction

22   business?

23   A    Yes, ma'am.

24   Q    Okay.  So you said that Long and Bogan were traveling

25   to South Florida to buy prescription pills.  What happened
```

1   thereafter?

2   A    After that, Bogan approached the defendant and to

3   start a new venture in opening a pain clinic.  They

4   initially wanted -- Bogan placed on ad on craigslist and

5   was contacted by a consulting firm.

6        That consulting firm then provided them the name of

7   Dr. 2.  They met with Dr. 2.  Dr. 2 was the driving force

8   for the Longwood location.

9        Initially, Long and Bogan wanted to open it up in

10  Brevard County, but they ended up opening it up in

11  Longwood, Florida.

12  Q    So once they hired Dr. 2 and got the business running,

13  how was this business operated?  What was Long's role and

14  Bogan's, according to Bogan?

15  A    According to Bogan, the defendant and Bogan were the

16  initial employees of the Professional Pain Center.  They

17  were getting all the patient files, paperwork together.

18  They were doing all of the paperwork in the office.

19       Once they started to gain more financial gain in the

20  business, they went outside and actually hired more

21  employees.

22  Q    And who was --

23  A    And more doctors.

24  Q    -- doing the hiring?

25  A    The defendant and Long -- and Bogan.  Sorry.

1    Q     And who was paying the checks, the payroll?

2    A     The defendant.

3    Q     Okay.  Do you know more or less on or about when did

4    this clinic open?

5    A     It opened more or less in October -- March of 2010.

6    Q     Okay.  Now, do you know if the defendant has any

7    background in the medical field?

8    A     No, ma'am.

9    Q     What was Dr. 1's background before becoming the --

10   before working for the Pain Center?  What did he --

11   A     Ophthalmologist.

12   Q     Okay.  Regarding making multiple deposits of the

13   proceeds of the firm, what was the understanding between

14   Bogan and Long?

15   A     That the defendant was the owner of the clinic and

16   controlled everything.

17   Q     I mean, regarding the cash deposits, what was your

18   understanding?

19   A     To stay under the $10,000 reporting requirements so

20   they didn't look like drug dealers.

21   Q     Let me ask you, did you interview anyone else as far

22   as employees of the clinic?

23         You said yes.  I'm sorry about that.

24         So can you please just tell the Court regarding some

25   of our witnesses, what did they say as to the defendant's

1    role as the operating manager, his knowledge as to what was

2    going on at the clinic?

3    A    All the defendants or all the witnesses advised that

4    the defendant was the true owner of the Professional Pain

5    Center.  He still made the -- directed everybody.  He was

6    directing the employees to get more patients in there.  And

7    it was all about the money.

8         The Defendant Bogan and Dr. 2 observed patients passed

9    out in the clinic.  And they would laugh about it.

10         They were accepting -- they had -- it's called a VIP

11   program where individuals were coming from outside the back

12   door and coming into the pain clinic and providing them

13   with tips because they were sponsoring individuals that

14   were addicted to narcotics or family members to get them in

15   to be seen faster by the doctors.

16   Q    So these were called VIPs?

17   A    Yes, ma'am.

18   Q    And as you were describing, they would come through

19   the back door?

20   A    Through the back door of the business.

21   Q    And who was accepting tips in order to get patients

22   seen faster as you're indicating?

23   A    The Defendant Long -- I mean, the Defendant Bogan and

24   other employees from the Professional Pain Center.

25   Q    And in addition to that, was there any discussion at

```
 1   any point regarding the defendant instructing any of the
 2   doctors as to what they should prescribe or not?
 3   A    The defendant told the other doctors to quit trying to
 4   change the prescriptions, that the patients were only there
 5   for the Oxys and the Oxys only.
 6   Q    Are you aware whether Oxycodone was the one substance
 7   that was pretty much prescribed the most at this clinic?
 8   A    Yes, ma'am.
 9   Q    Regarding these witnesses, did they confirm that this
10   business was pretty much a cash-only business?
11   A    Yes, ma'am.  They were -- once they received the
12   payments from the patients, they would put them in
13   envelopes and then put it in a safe.
14   Q    Are you aware also whether any of our undercover
15   business revealed that some of the employees were also
16   accepting tips so that they could avoid providing a urine
17   test?
18   A    Yes.  The employees were accepting tips to bypass
19   individuals taking a urinalysis.  And if an individual
20   tested positive for, say, cocaine, they would mark it on
21   their chart that they tested negative for cocaine.
22   Q    Now, in addition to that, let me ask you as to the
23   deposits.  Was there any understanding by the employees or
24   instructions -- strike that.
25        Did the defendant instruct any of the employees to
```

```
1    stay under the reporting requirements as far as the way

2    that they were supposed to place the money in envelopes,

3    whatnot?

4    A    Yes, ma'am.

5    Q    Okay.  How so?

6    A    The defendant just instructed the employees -- after

7    the defendant left, his father then became the main source

8    of directing the deposits, depositing the cash proceeds

9    from the clinic.

10         And he had also instructed the other employees to,

11   when they do it, to stay under the $10,000 reporting

12   guidelines, to make multiple deposits.

13   Q    What do you mean -- to make multiple deposits, what do

14   you mean by that?

15   A    To make multiple deposits throughout the day so that

16   it's structured so, say, $5,000, $2,000, another $2,000.

17   They were structuring the deposits so they are not having

18   to require the paperwork to fill out for depositing over

19   $10,000.

20   Q    And according to Bogan, what was the purpose of doing

21   it in this way?

22   A    To stay -- so they didn't look like drug dealers and

23   to stay under the reporting requirements.

24         MS. RIVERA MIRANDA:  I have no further questions,

25   Your Honor.
```

1          THE COURT:  Thank you.

2          Mr. Phillips?

3          MR. PHILLIPS:  Your Honor, I have a few.

4                    **CROSS EXAMINATION**

5    BY MR. PHILLIPS:

6    Q    Mr. Whitmore, how long -- make sure I have the time

7    frame correct -- was Mr. Long titularly the head of

8    Professional Pain Center?

9    A    The whole time.

10   Q    No.  Right?  Didn't Dr. 1, 2, 3, whoever, become

11   titular head of it?

12   A    On paper.

13   Q    That's what I'm talking about.

14   A    On paper.

15   Q    Looking at the records of the Secretary of State,

16   Sunbiz and whatnot, January '11 -- January 2011, right?

17   A    Yes, sir.

18   Q    And the place was incorporated, I think you said, in

19   October of '09?

20   A    Yes, sir.

21   Q    So between those two dates he's the -- Mr. Long is the

22   president on paper.  And then Dr. So-and-So becomes the

23   head of it?

24   A    Yes, sir.

25   Q    Okay.  In your investigation, did you determine what

```
1    Mr. Long's educational background was?

2    A     No.

3    Q     No.  So you don't know if he has a Ph.D. or GED,

4    right?

5    A     No, sir.

6    Q     How about Mr. Bogan?  Did you do any homework on him?

7    A     No, sir.

8    Q     So you don't know if he has a medical degree or

9    medical background or any licensure or training or

10   experience?

11   A     He had a license as an EMT.

12   Q     He's was a licensed EMT.  Are EMTs allowed to dispense

13   pharmaceuticals?

14   A     No, sir.

15   Q     They're allowed to administer them, though, are they

16   not?

17   A     Yes.  Actually, an EMT, no.  A paramedic, yes.

18   Q     An EMT is not allowed to but a paramedic is.

19   A     Yes.

20   Q     But only under the direction of a physician?

21   A     Yes, through the fire department's attending

22   physician.

23   Q     When you interviewed all of the folks that you

24   interviewed, the employees and whatnot, after January 11,

25   who ran the clinic day to day?
```

```
1    A    Day-to-day operation was Bogan, but the defendant

2    still directed Bogan what to do by their testimony.

3    Q    According to Bogan?

4    A    No, according to the witnesses.

5    Q    How about according to Mr. Long?

6    A    According to Mr. Long?  His testimony?  He was still

7    the owner of the pain clinic.

8    Q    But he did not run it day to day after January of

9    2011, right?

10   A    He was still there.

11   Q    Didn't Bogan testify to you that Long left the

12   day-to-day operations in January of 2011?

13   A    No.  Just Bogan changed the ownership of the business.

14   The defendant --

15   Q    I agree they did that.  That's not a point of dispute.

16        The issue is, who was there day to day after the

17   changeover?

18   A    The majority of the time it was Bogan towards the end.

19   Q    And your investigation didn't reveal, did not reveal,

20   did it not -- if I may phrase that correctly -- that

21   Mr. Long took any tips from these patients, right?

22   A    From testimony from other employees.

23   Q    They say Long took tips?

24   A    Yes, sir.

25   Q    Did he prescribe or sell drugs?
```

```
1    A    No, sir.

2    Q    Because he's not a doctor, right?

3    A    Exactly.

4    Q    How many total doctors were involved in this center?

5         MS. MIRANDA:  Your Honor, I would object on

6    relevance and outside the scope.

7         THE COURT:  Objection is overruled.

8         THE WITNESS:  Let me count.

9         Off the top of my head, I can think of ten.

10   BY MR. PHILLIPS:

11   Q    Could be as high as 12?

12   A    Could be.

13   Q    And these folks would have had, at least some point in

14   their association with the clinic, possessed a license to

15   practice medicine, right?

16   A    Yes, sir.

17   Q    With respect to the assets at issue, you're aware, are

18   you not, that the Longs, both Mr. Long and Mrs. Long, have

19   come to an agreement with the Government for the forfeiture

20   of all of those real properties that they purchased with

21   the proceeds, right?

22   A    Yes, sir.

23   Q    And that we've worked out a circumstance where one of

24   the houses have been allowed to be purchased back so that

25   Mrs. Long and the children will have a place to live,
```

1    right?

2    A    That's my understanding.

3    Q    And that those funds are free of the taint of the

4    operation of this business?

5          MS. RIVERA MIRANDA:  Objection, Your Honor.

6    That's way outside the scope of the testimony and I believe

7    already subject of whatever papers have been filed with the

8    Court as to the forfeiture aspect of the case.

9          MR. PHILLIPS:  Your Honor, I think it's absolutely

10   within the scope.  She went into forfeiture a bit.  I want

11   to make sure the Court understands that the Longs have

12   fully cooperated and done what they said they would do so

13   far as to actually agree to the forfeiture of all the

14   assets.

15         MS. RIVERA MIRANDA:  That's not in dispute,

16   Your Honor.

17         THE COURT:  Okay.  Well, I'm going to allow it.

18         We're in a sentencing proceeding.  So what I asked

19   for at the time of the status was to have a broader picture

20   of the operation of the conspiracy.  This is helpful to me,

21   Ms. Rivera.

22         So I'm mindful of the fact that this is an ongoing

23   investigation.  And I suspect that there are concerns about

24   compromising it.  And I'm sure Mr. Phillips will be careful

25   about that.

```
 1              But I think that efforts that the defendant has

 2    made to work out an agreement with the Government with

 3    respect to the forfeiture issues is potentially relevant to

 4    the overall issue of sentencing.

 5              I'm going to permit it.

 6              MR. PHILLIPS:  Thank you, Your Honor.

 7    BY MR. PHILLIPS:

 8    Q    Let me ask you about, did the professional pain clinic

 9    ever hire a consultant to assist it with its business

10    operations?

11    A    Yes.

12    Q    I'm not going to name the consultant for obvious

13    reasons.  We'll just call him or her the consultant.

14         Fair enough?

15    A    Yes, sir.

16    Q    Excellent.

17         Who hired the consultant?

18    A    I can't recall at this time.

19    Q    Who put the ad on craigslist?

20    A    I don't know if there was an ad on craigslist.

21    Q    Do you know how the clinic got in touch with the

22    consultant in the first place?

23    A    I remember when other pain clinics got shut down,

24    Bogan advised that Jamie had -- the defendant has got it

25    taken care of.
```

1          THE COURT:  I thought you testified on direct

2   examination that the defendant put an ad on craigslist and

3   that's how he obtained contact with the consultant and

4   that's how he was connected with Dr. 2.

5          THE WITNESS:  Bogan put an ad on craigslist.

6          MR. PHILLIPS:  That's exactly my point,

7   Your Honor.  It was Bogan who brought the consultant to

8   bear, if you will.

9          THE WITNESS:  Yes.  Not the -- which consultant

10  are you talking about?  The initial consultant or the

11  consultant towards the end?

12  BY MR. PHILLIPS:

13  Q    My understanding is it's the consultant who provided

14  guidance in compliance, if you will, as opposed to

15  establishment of the business.

16  A    That consultant, I don't recall who placed an ad.

17  Q    Based on your familiarity with the investigation, is

18  it fair to say that Mr. Long was the first in the door, the

19  first to cooperate, so to speak?

20  A    I don't know if he was the first or the second.

21  Q    Would you agree with Ms. Miranda if she said he was

22  first?

23          MS. RIVERA MIRANDA:  Your Honor, I would object to

24  that.  It really calls for speculation on the part of the

25  witness here, who's first or second.

```
 1              THE COURT:  That part is sustained.  I think the
 2    question has been asked and answered.
 3    BY MR. PHILLIPS:
 4    Q    Has Mr. Long ever tested positive for the presence of
 5    opioids?
 6    A    I've never tested on someone to be able to tell you
 7    that answer.
 8    Q    So during his release pending sentencing --
 9    A    I have no clue.
10    Q    You don't know?
11              MR. PHILLIPS:  Your Honor, if I might have just a
12    moment?
13              THE COURT:  Yes.
14              MR. PHILLIPS:  Thank you.
15              Your Honor, I have no further questions.
16              THE COURT:  Anything further from the Government,
17    Ms. Rivera?
18              MS. RIVERA MIRANDA:  Your Honor, very briefly, if
19    we can just clarify the aspect about the consultant.
20                      REDIRECT EXAMINATION
21    BY MS. RIVERA MIRANDA:
22    Q    When you testified regarding the consultant initially,
23    what were you referring to?
24    A    There's a consultant firm that finds doctors for pain
25    clinics.  And that's what I was referring to as the
```

```
 1    consultant.

 2          Now, there's also another consultant towards the end

 3    who tries to help these pain management clinics to come

 4    within compliance with the State.

 5    Q     Now, regarding the first consultant, who contacted

 6    that consultant for what purpose?

 7    A     To fund -- he contacted -- I can't recall who.  I

 8    believe it was Bogan.  He contacted Bogan to provide a name

 9    of a doctor, which was Dr. 2.

10    Q     The consultant contacted Bogan to provide a name of a

11    doctor?

12    A     Yes.

13    Q     And that person became the first attending physician

14    at the clinic?

15    A     Yes.

16    Q     Okay.  And when did that happen?  At what point after

17    Bogan and Long had agreed as to what they were doing with

18    this business, that they were going to initiate a business

19    venture?  When did that happen?

20    A     About six months later.

21               MS. RIVERA MIRANDA:  Thank you.

22               No further questions, Your Honor.

23               THE COURT:  Thank you.

24               You can step down, Officer Whitmore.

25               Any other evidence from the United States?
```

```
 1              MS. RIVERA MIRANDA:  Your Honor, we would just
 2    like to maybe proffer some and present some arguments to
 3    the Court.  That would be all.
 4              THE COURT:  Sure.  I just wanted to know if we had
 5    any more witnesses.
 6              But I'm happy to hear from the United States now
 7    in connection with the Government's either effort to
 8    provide me with more information about the nature, extent
 9    of the defendant's involvement or the scope of the
10    conspiracy and/or the Government's recommendations with
11    respect to sentencing.
12              MS. RIVERA MIRANDA:  Thank you.
13              Your Honor, the information that we have regarding
14    the nature of the offense -- and this is directed at 3553
15    factors.
16              The guidelines, they are what they are in this
17    case.  And I understand that the total offense level is
18    quite high due to the amount of the units that were
19    prescribed in this case outside the scope of medical
20    practice; and also the value of the proceeds, the actual
21    number of the proceeds in this case, which was well over
22    $5 million.
23              We know that from 2010 to 2013 -- and those are on
24    or about dates -- Long and others, they used this
25    Professional Pain Center located in Longwood, Florida, to
```

1    illegally dispense controlled substances for no legitimate

2    medical purpose.  They basically ran a pill mill operation

3    as corroborated by two expert witnesses.

4            Long made the initial monetary investment to open

5    the clinic.  He was approached by Bogan with this idea.

6    Because at the time, they were already buying pills from

7    South Florida and selling them on an individual basis.

8            But this became a business venture.  And in order

9    to get this up and running, as the Court heard, they went

10   online.  They got a consultant.  They were able to hire the

11   first doctor.

12           And once that happened, well, we know from the

13   evidence in the case that the doctor, Dr. 2, that he ran

14   the medical side, and the defendant and Bogan were in

15   charge of the operation of the clinic.

16           We also know that at some point in time the laws

17   changed, and they were required to have an attending

18   physician as the president of the clinic.

19           So Dr. 1 became that person.  However, our

20   witnesses indicate and Long confirmed that he was -- that

21   Dr. 1 was the owner on paper, but pretty much it was the

22   defendant who was running this operation.

23           And that he was all about the money.  That was his

24   focus as to the operation of the clinic, to make sure that

25   the proceeds of the illegal operation were distributed in

```
 1   amounts that would stay under $10,000 to avoid reporting
 2   requirements.
 3          And that the deposits -- they would make these
 4   deposits in a given day in amounts of less than $10,000.
 5   But the aggregate value of those proceeds on any given day
 6   would exceed $10,000.
 7          And the money was used to buy real estate
 8   properties and to invest in other ventures that are a
 9   subject of the forfeiture agreement.
10          The defendant knew of the illegal operations of
11   these doctors.  And he encouraged them.  There were
12   patients -- this is basically a stand up only clinic.
13   Because it was filled with patients.
14          We have evidence that patients were doing
15   hand-to-hand transactions at the parking lot.  Employees
16   were instructing some of the patients to wait in the rear,
17   in the parking lot that was on the back side so as to avoid
18   unwanted attention to the clinic.
19          We also know that this defendant in particular had
20   his VIPs that would come through the back door.  And they
21   were sponsoring patients.
22          And basically they would have these drug addicts
23   coming to the clinic to get their prescriptions and then
24   buy them from the drug addicts.  The VIPs were sponsoring
25   people that had drug addiction problems.
```

1          So some of these patients had visible track marks.

2    They were still being seen by the physicians.  And our

3    experts, in their review of the patient files, noticed this

4    egregious pattern of overprescribing these controlled

5    substances, particularly Oxycodone.  And then in

6    combination with other substances, that if taken together,

7    could possibly be illegal.

8          It was pretty outrageous.  They had one doctor

9    there that actually cared about reducing the dosages that

10   thought that they needed to handle things differently.

11         Well, I have evidence from one of my witnesses

12   that this particular defendant wanted to fire that doctor

13   and that he gave instructions that doctors were not to

14   change the prescriptions, that the patients were not there

15   to get Dilaudid or Percocet.  They were there to get

16   Oxycodone.

17         So in that regard, that is the evidence of -- as

18   part of the evidence of his knowledge.  And as far as his

19   role, he was pretty much involved in the financial aspect

20   of it and then making sure that things would stay up and

21   running.

22         He hired other family members to be there.  His

23   wife, he met at the clinic.  She also worked there for an

24   amount of time.  And she received a substantial amount of

25   money as a result of this.

1          His father worked at the clinic as well.  And

2     other members of his family benefited as well from this

3     illegal venture.

4          We understand that when we look at his background,

5     he had a supportive family.  He had a good childhood.  And

6     he was given opportunities in life.  It is unfortunate that

7     he chose this path.

8          However, the Government recognizes that yes, he

9     was one of the first individuals in this case to come

10    forward and accept responsibility.  Actually, he's the

11    first one to plea in this matter and to agree to provide

12    cooperation in this case and be willing to testify against

13    others.  And that's something that carries some weight with

14    us in our recommendation.

15         I know that we are recommending a guideline

16    sentence.  But I also understand that the Court in this

17    case has, has information, has received information from

18    the defense in their sentencing memo which may lead the

19    Court to vary.

20         And that's something that I would not object to in

21    this case, Your Honor, considering his role, the nature of

22    the offense, the early acceptance of responsibility, the

23    fact that he has agreed to the forfeiture of all these

24    assets that were, that were used, that were purchased with

25    proceeds of this operation.

```
 1              And we have not filed a 5K motion at this point
 2    because it's not ripe considering what may happen in the
 3    future.
 4              But we still would like the Court to consider
 5    that, yes, the defendant has demonstrated that he's
 6    remorseful and that he is fully accepting responsibility in
 7    this case.
 8              That would be our submission, Your Honor.
 9              THE COURT:  Thank you, ma'am.
10              Ms. Rivera, has Mr. Bogan been charged?
11              MS. RIVERA MIRANDA:  He has not, Your Honor.
12              THE COURT:  Have any of the physicians been
13    charged?
14              MS. RIVERA MIRANDA:  No, Your Honor.
15              And Dr. 2 is deceased.
16              THE COURT:  Okay.  Thank you.
17              Mr. Phillips?
18              MR. PHILLIPS:  Your Honor, briefly.
19              On the legal analysis side, before my client
20    addresses the Court and shares with the Court his personal
21    view of the universe, if you will, I'm very thankful as an
22    advocate that Booker and Fanfan exist.  Because but for
23    them, we would be bound by the guidelines.
24              And I think this is a case that I think the
25    Government would tacitly agree where the guideline
```

1    computation grossly overrepresents the outcome that should

2    be imposed here.

3              Your Honor, Mr. Long was involved in the business.

4    He was pitched the business.  He agreed to get involved in

5    it.  He was involved in it.  He did what they said he did,

6    and he has agreed to plead guilty to the crimes that stem

7    from it.

8              That point is of no material moment and certainly

9    no material debate.  We're here for that reason.  The issue

10   is, just what did he do?

11             Bogan came to him, pitched him a deal.  Mr. Long

12   made the decision to get involved in what was wrapped up,

13   unfortunately, in drug trafficking but really no more than

14   a get-rich-quick scheme.  It's, hey, I've got a great idea.

15   Let's go out and make money with this.

16             And, unfortunately, they were successful early on

17   in their endeavor.  And that got Mr. Long deeper involved.

18   And he did -- like I said, what he did, he conspired to

19   commit money laundering, among other things.  And the

20   relevant conduct laid out in the PSR, I think, is quite --

21   is amply clear.

22             On the other side, he has, Your Honor, as a person

23   of ultimately good character, first in the door, full

24   cooperation, no holds bar, nothing held back.  He is in for

25   a penny, in for a pound at every moment and has been from

```
 1   the moment of contact and certainly from the moment of our
 2   retention.
 3            He's proffered.  He's done everything he can.  I
 4   think Ms. Miranda is absolutely correct.  5K would be super
 5   appropriate if only it were ripe.
 6            And I think the Court asked the correct questions.
 7   The other folks have not yet been charged.  It's tough to
 8   look on this record and see how a 5K would be received
 9   because his cooperation is by no means complete.
10            Because his cooperation will continue until it is
11   complete, according to the Government, whether that's
12   continued proffer or grand jury or trial testimony or
13   sentencing testimony, whatever it is, Mr. Long is there and
14   will continue to tell them the truth as he has from the
15   get-go.
16            Consequently, Your Honor, as the Court saw, I'm
17   sure, from our sentencing memorandum, we believe a
18   240-month incarcerative sentence is simply way too high and
19   doesn't truly represent ultimately what he did, his role in
20   the offense, and the importance of his existence to the
21   overall success of the business that underlies the entire
22   thing.
23            At the end of the day, Your Honor, I have to agree
24   with the AUSA that ultimately some departure from the
25   called-for guideline sentence is appropriate.
```

```
 1    Booker/Fanfan allow it.  And, frankly, I think it's simply

 2    the just and right result at this intermediate stage of

 3    Mr. Long's involvement in the case.

 4          That having been said, Your Honor, I'm sure none

 5    of those observations come as a surprise based on our

 6    sentencing memorandum.

 7          Mr. Long would like to speak, would like to

 8    address the Court briefly and tell the Court what's going

 9    through his mind and his heart as we stand here.

10          THE COURT:  Thank you, Mr. Phillips.

11          Mr. Long, come on up and join your lawyer at the

12    podium.

13          Good morning.

14          THE DEFENDANT:  Good morning.

15          I'm just here to say I did wrong.  I'm here to pay

16    for the crime.  I'm not a bad person.  I made a big

17    mistake.  And the last four years have been the worst not

18    knowing if I'm going to be here with my kids.  I have

19    little kids at home.  I just want to be there for them.

20          You know, I just want a second chance on life.

21    You know, I'm not going to back down and say I'm right, you

22    know.  I just -- I'm not, I'm not this -- I've never been

23    this type of person.

24          And I raised my other two daughters by myself.

25    All I'm asking is for a second chance so I can be there for
```

```
 1    my children and my wife and raise them.

 2              And this would never happen -- I would never be

 3    involved in anything like this.  I should have walked away

 4    and I didn't.

 5              It's my fault.  And it just -- I'm sorry for what

 6    I've done.  There's not a day that goes by I wish I would

 7    have never got in that.

 8              Thank you.

 9              THE COURT:  Thank you, sir.

10              Mr. Long, before you leave, I know you know you're

11    going to prison.  The question is for how long.

12              And the decision that I have to make is looking at

13    the nature and circumstances of this offense, which I will

14    tell you what you probably already know.  But I'll just

15    remind you that when I look at the information that's

16    contained in the presentence report, this business venture

17    resulted in the issuance of 19,685 prescriptions for

18    1,538,282 dosage units of Schedule II medications.

19              From December of 2010 to December of 2011,

20    1.53 million dosage units were prescribed by Dr. 1.  And

21    from December 19th of 2012 to June 11th, 2013,

22    1.55 million dosage units were prescribed by Dr. 1 for the

23    immediate release of Oxycodone in addition to other

24    Schedule II narcotics.

25              If you sat in my seat, Mr. Long, and saw the
```

1    ravage that Oxycodone abuse is inflicting on our society,

2    you too would be, I think, in a state of shock with respect

3    to the size of this operation.  $5.5- to $6 million in

4    essentially what results in washed cash coming through this

5    operation being deployed as a result of illegal activities.

6            The impact that this clinic has on the citizenry

7    of the Middle District of Florida and the people who came

8    from outside the district to obtain narcotics illegally is

9    very hard to measure, but I can assure you that many, many

10   lives have been ruined in the process.

11           Now, it may be that these individuals would have

12   obtained these illicit narcotics somewhere else if it

13   hadn't been for your clinic, but I don't know that.  I do

14   know that they got them there, and I do know that you and

15   your co-conspirators made that possible and facilitated the

16   distribution of these drugs into our society.

17           And I know because I see it every day what the

18   harm is as a result of that illegal drug trafficking.  And

19   the Court takes this offense incredibly seriously.

20           And, frankly, that's why the guidelines recommend

21   a 20-year sentence is because the scope of this crime is

22   extensive.  The implications and impact of this crime are

23   extensive.

24           And the lives impacted by your decision -- not

25   just the lives of the Long family.  Obviously your wife and

1     your children, all of those people are victims of your poor

2     decision-making.  Nobody can take responsibility for that

3     other than you, Mr. Long.

4              It's not my problem.  It's not the Government's

5     problem.  It's not Mr. Phillips' problem.  It's the result

6     of your -- it's the result of your bad choices.

7              Now, that said, you have the rest of your life in

8     front of you to, you know, make decisions about -- trying

9     to make better choices and using your time while you're in

10    custody in a positive way and doing whatever you can to try

11    to encourage the Government to come to your aid and seek

12    some further modifications of whatever sentence that I

13    impose.  That's up to you.

14             But you're here today because of the decisions

15    that you made in the past.  What happens from this time

16    forward, whether this defines you in your life, that's up

17    to you.  You still have the ability to influence what

18    happens from this point forward.

19             But I appreciate your allocution.  I accept the

20    fact that you are remorseful.  I think that your expression

21    of regret is sincere, and I'm going to take that into

22    account.

23             You can have a seat back over there with

24    Mr. Phillips.

25             Is the Government aware of any legal bar or

1    impediment to proceeding with the imposition of sentence?

2         MS. RIVERA MIRANDA:  No, Your Honor.

3         THE COURT:  And Mr. Phillips?

4         MR. PHILLIPS:  No, Your Honor.

5         THE COURT:  All right.  In addition to the 3553

6    factors that I've already articulated into the record, I

7    also want to note for the record that in addition to those

8    aggregating factors that I mentioned, the Court is also

9    taking into account the mitigation offered by the defendant

10   as well as the mitigating facts that are reflected in the

11   PSR.

12        And that includes the fact that Mr. Long, as I

13   mentioned, has accepted responsibility for his conduct.

14   And I know he's got some prior relatively innocuous

15   offenses, but he comes before the Court with no significant

16   prior criminal history.

17        I do take the cooperation with respect to the

18   forfeiture of the real estate into account.  I think that

19   is a credit to you, Mr. Long, in recognition that that

20   property was obtained through the proceeds or through

21   ill-gotten gain.

22        And the Government's, of course, representation

23   that you've been cooperative in connection with their

24   ongoing investigation, which I hope based on what I've

25   learned at this point about the operation proves to be

```
 1   fruitful.

 2          So I think in light of all of those factors based

 3   on where we are today, a variant sentence is appropriate.

 4   And I intend to vary downward and impose a sentence of

 5   180 months and 2 years of supervised release.

 6          And, Mr. Long, if you and Mr. Phillips will stand,

 7   I'll proceed with the imposition of sentence.

 8          The Court's inquired as to whether there's any

 9   legal bar or impediment to proceeding with the imposition

10   of sentence.  And having heard none, having reviewed the

11   defense memorandum and heard the allocution of the

12   defendant, the Government's presentation as well as

13   arguments presented by defense counsel in mitigation,

14   having reviewed Title 18 of the United States Code,

15   Section 3551 and 3553, it is the judgment of the Court that

16   the defendant, James Long, be committed to the custody of

17   the Bureau of Prisons to be imprisoned for a term of

18   180 months.

19          Upon release from imprisonment, you shall serve a

20   2-year term of supervised release.

21          You're ordered to comply with the standard

22   conditions in the Middle District of Florida as well as the

23   following special conditions:

24          I'm going to order you to refrain from engaging in

25   any type of employment that's associated with or related to
```

1    any type of medical practice or pharmaceutical operation.

2          I'm going to order you to cooperate in the

3    collection of DNA as may be directed by the Probation

4    Office.

5          I am going to impose the mandatory drug testing

6    requirements of the Violent Crime Control Act.

7          I'm going to waive the imposition of a fine

8    primarily because of your financial status and your

9    cooperative efforts with respect to the forfeiture of

10    personal property that was attained as a result of the

11    proceeds of your conspiracy.

12          The Government advises me that there's no

13    forfeiture matter for the Court to consider.

14          You're ordered to pay the United States a special

15    assessment in the amount of $100, which is due immediately.

16          I accepted the plea agreement because I'm

17    satisfied that the agreement adequately reflects the

18    seriousness of the offense behavior and does not undermine

19    the statutory purposes of sentencing.

20          I've considered all of the advisory sentencing

21    guidelines and all the factors identified in Title 18 of

22    the United States Code, Section 3553(a)(1) through (7)

23    whether I specifically referenced them in my expression of

24    reasons or not.

25          And I deem the sentence in my judgment to be

```
 1    sufficient but not greater than necessary to achieve the
 2    statutory purposes of sentencing.
 3             It's my responsibility, Mr. Long, to advise you
 4    that you have a right to appeal the sentence of the Court
 5    within 14 days from today's date or the day it's reduced to
 6    writing, whichever is later.  Failure to appeal may be a
 7    waiver of your right to appeal in addition to whatever
 8    waivers may be contained in your plea agreement.
 9             You're entitled to the assistance of a lawyer.  If
10    you cannot afford a lawyer, one will be provided for you.
11             If you cannot afford the filing fee, the Clerk of
12    the Court will be directed to accept the filing fee -- or
13    accept the notice of appeal without the payment of the fee.
14             Let's take up the issue of remand or voluntary
15    surrender.
16             What's the Government's position with respect to
17    remand?
18             MS. RIVERA MIRANDA:  May I have a moment,
19    Your Honor?
20             THE COURT:  Yes.
21             (Discussion off the record.)
22             MS. RIVERA MIRANDA:  Your Honor, we wouldn't
23    oppose the defendant's request in this case that he
24    surrender at the beginning of March.
25             Because they're still trying to -- they're still
```

```
 1    trying to relocate.  They have to move out of their house.

 2    I believe there are some matters that he has to address

 3    with his family.

 4          And we wouldn't oppose the request based on his

 5    current state and that of his compliance with the terms of

 6    his release.

 7          THE COURT:  I don't have a report from Pretrial

 8    Services.  Does the Government have any indication that

 9    there have been any issues while he's been on pretrial

10    release?

11          MS. RIVERA MIRANDA:  No, Your Honor.

12          MR. PHILLIPS:  And, Your Honor, we would ask for

13    about March 15 because the Longs have to relocate to

14    another home.  The people in that home now have just been

15    given notice to vacate.  They have until the end of

16    February to vacate.

17          I figured the first two weeks of March, if we go

18    crazy, we can get everything done and finished so that he

19    can report and his family will be where they should be.

20          THE COURT:  All right.  I'm going to grant the

21    defense request for voluntary surrender and permit the

22    defendant to report to the institution designated by the

23    Bureau of Prisons no later than 2:00 the afternoon of

24    March 15th of 2017.

25          The Court having announced sentence, does either
```

```
 1    counsel for the Government or counsel for the defendant

 2    have any objection to the Court's factual findings, the

 3    sentence, or the manner in which the sentence was imposed?

 4            Ms. Rivera?

 5            MS. RIVERA MIRANDA:  Your Honor, we have no

 6    objection.

 7            We would just like to note that as to the amended

 8    preliminary order of forfeiture, document 47, we would like

 9    for the forfeiture to be included in the judgment.

10            THE COURT:  Yes, ma'am, I will.  That's at doc 47,

11    entered December the 22nd of 2016.  And I will

12    incorporate the forfeiture order in my final judgment.

13            MR. PHILLIPS:  Your Honor, we also have no

14    objection.

15            I would ask the Court to recommend a location of

16    designation for Mr. Long close to Central Florida,

17    preferably the Coleman facility.

18            THE COURT:  Okay.  I'll do that, Mr. Long.  I'll

19    include a recommendation that the Bureau of Prisons house

20    you at Coleman.  They have their own system that they use

21    for prisoner location.  My recommendation is just one of

22    many things.  So it may not carry the day.

23            Sometimes I'm not sure they pay any attention to

24    it at all.  But perhaps they will.  And I'd be glad to

25    include it.  And to the extent that it's helpful in terms
```

1   of you getting closer to your family, I'm happy to

2   incorporate that.

3            Anything else from the United States?

4            MS. RIVERA MIRANDA:  Nothing further, Your Honor.

5            Thank you.

6            THE COURT:  Anything further, Mr. Phillips?

7            MR. PHILLIPS:  No, Your Honor.

8            THE COURT:  Thank you.  We'll be in recess.

9            (Proceedings adjourned at 10:30 a.m.)

10                        * * * * *

11

12                   C E R T I F I C A T E

13

14       I certify that the foregoing is a correct

15   transcript from the record of proceedings in the

16   above-entitled matter.

17

18   July 16, 2018

19

20       s\  Amie R. First
     _____
     Amie R. First, RDR, CRR, CRC, CPE
21   Federal Official Court Reporter
     United States District Court
22   Middle District of Florida

23

24

25