UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 6:16-cr-180-Orl-37GJK |
| JAMES LONG, | ) ) ) |
| Defendant. | ) ) |

**DEFENDANT'S MOTION TO COMPEL THE
GOVERNMENT TO FILE A RULE 35 MOTION
AND REQUEST FOR AN EVIDENTIARY HEARING ON THE SAME**

The defendant, James Long [hereinafter "Mr. Long"], by and though his undersigned counsel, hereby respectfully moves, pursuant to Federal Rule of Criminal Procedure 35(b)(2), for an Order compelling the government to file a motion recognizing Mr. Long's substantial assistance to the government, and requests an evidentiary hearing on the same. In support thereof, Mr. Long states as follows:

**I.   RELEVANT CASE HISTORY**

**A.   Procedural History**

1.   On September 14, 2016, the government filed an information charging Mr. Long with one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). [Dkt. 1].

2.   On October 11, 2016, Mr. Long appeared before the Court, waived his right to be indicted by a grand jury, and pled guilty to the sole count in the information. [Dkts. 26, 27, 28,

29, 30, and 31]. Prior to his guilty plea, Mr. Long and the government entered into a plea agreement. [Dkt. 3]. As part of this plea agreement, Mr. Long agreed to fully cooperate with the government and the government agreed to consider whether Mr. Long's cooperation qualified for a substantial assistance downward departure, pursuant to either U.S.S.G. §5K1.1 or Fed. R. Crim. P. 35(b). Id. at ¶ 9.

       3.      On December 30, 2016, the United States Probation Office issued its revised Presentence Investigation Report [hereinafter "PSIR"]. [Dkt. 52]. According to the PSIR, there were no specifically identifiable victims of Mr. Long's offense. Id. at ¶ 53.

      4.      Mr. Long's case arose out of a much larger government investigation of individuals involved with, and relating to, the Professional Pain Center, located at 860 East State Road 434, Longwood, Florida. The government's investigation began in January, 2011, and continued into 2018, when the government decided to finally close its investigation. The government identified numerous targets during its investigation, including multiple medical doctors who were over-prescribing controlled substances outside the course of professional practice, and without a legitimate medical purpose. According to the PSIR, a total of ten physicians worked at the Professional Pain Center during the conspiracy. Id. at ¶ 10. During the conspiracy, some of the physicians at the clinic illegally prescribed several prescriptions and controlled substances, including Oxycodone and Oxycontin. According to a search warrant affidavit prepared by the government, at least two overdose deaths were attributed to controlled substances prescribed by these medical doctors. Moreover, the conspiracy netted approximately $5.5 million in illegal proceeds.

      5.      In addition to the medical doctors, the government identified Daniel Bogan, who played an integral role in the conspiracy and was likely more culpable than Mr. Long, with respect

to the illegal activity conducted at the Professional Pain Center.

6. On December 29, 2016, Mr. Long filed a Sentencing Memorandum. [Dkt. 51]. In the memorandum, Mr. Long brought to the Court's attention the fact that he was only a small piece of a much larger conspiracy, involving several other uncharged targets who were more deeply involved and possibly more culpable. Id. at n. 1. Mr. Long also informed the Court that he had already started the process of providing substantial assistance to the government, at two separate proffer meetings, on August 9, 2013 and October 14, 2016, respectively. Id., at p. 3. Mr. Long also stated in his Sentencing Memorandum that he expected to attend additional proffers as the government's investigation continued. Id.

7. On January 9, 2017, the Court began Mr. Long's sentencing hearing. [Dkts. 56, 89]. During the hearing, the government confirmed that its investigation was ongoing, that there were multiple targets, and that Mr. Long was cooperating:

> This clinic is no longer in operation. And basically we have been in the process of reviewing patient files, obtaining expert advice, interviewing targets, and trying to develop cooperating witnesses in this case so we can move forward against other individuals, including doctors and other people who participated in the conspiracy. However, this defendant's cooperation -- and this is the reason why a 5K motion was not filed -- is ongoing. It's not yet ripe for the Government to file a motion for reduction of sentence.

[Dkt. 89, at p. 4].

8. At the initial sentencing hearing, the Court expressed concern about sentencing Mr. Long while the government's vast investigation was still ongoing:

> So until I know the scope of the conspiracy, I don't think I can do my job. I don't think I can appropriately sentence Mr. Long until I know the scope of the conspiracy; I know what Mr. Long's role was in the conspiracy vis-a-vis his co-conspirators; the length of time that he was involved in the conspiracy; how he first became ensnared in the conspiracy, either voluntarily or through solicitation

> from someone else. Those are all -- at least when I sentence an individual that's involved in a conspiracy, those are things that I need to know in order to figure out what is a just sentence. So I'm concerned about trying to move forward with Mr. Long at this stage of the Government's investigation into the overall conspiracy. And I would be – I'm just reluctant to do it. So once I've sentenced Mr. Long, I've sentenced him.

[Dkt. 89, at p. 5].

The Court further stated:

> It's a tougher job on the Court to sentence the early, you know, the participants, especially in a large conspiracy. When you have the earlier participants, you don't have a full grasp of the scope and depth and expansive nature of the conspiracy.

Id., at p. 13. The Court also astutely recognized that Mr. Long was only a single participant in a much larger and more serious "pill mill" operation:

> But I'm particularly troubled in this case because of, first of all, the nature of the conspiracy, even though I know it's a money laundering charge. It arises from essentially a pill mill operation. And there are medical practitioners involved. There are prescriptions involved. This defendant doesn't have the authority to write a prescription.

Id. At the conclusion of the first sentencing hearing, the Court adjourned the case to give the government an opportunity to provide more information on Mr. Long's role in the overall offense:

> And so I just don't feel like I have enough information. So hopefully with that the Government can go back and figure out what you're going to need to do in order to get me informed enough that I'm comfortable proceeding with Mr. Long's sentencing.

Id.

9. On February 2, 2017, the Court resumed Mr. Long's sentencing. [Dkts. 65, 90]. At this hearing, the government acknowledged that Mr. Long was among the first individuals to cooperate and testify against his co-conspirators:

> However, the Government recognizes that yes, he was one of the first individuals in this case to come forward and accept responsibility. Actually, he's the first one to plea [sic] in this matter and to agree to provide cooperation in this case and be willing to testify against others. And that's something that carries some weight with us in our recommendation.

[Dkt. 90, at p. 38].

10. After receiving some supplemental information from the government concerning the investigation and hearing the government's sentencing remarks, the Court was left with the impression that a Rule 35 motion was a possibility for Mr. Long:

> Now, that said, you have the rest of your life in front of you to, you know, make decisions about – trying to make better choices and using your time while you're in custody in a positive way and doing whatever you can to try to encourage the Government to come to your aid and seek some further modifications of whatever sentence that I impose. That's up to you.

Id., at p. 45.

> I do take the cooperation with respect to the forfeiture of the real estate into account. I think that is a credit to you, Mr. Long, in recognition that that property was obtained through the proceeds or through ill-gotten gain. And the Government's, of course, representation that you've been cooperative in connection with their ongoing investigation, which I hope based on what I've learned at this point about the operation proves to be fruitful.

Id., at pp. 46-47. The Court also made inquiries of the government, indicating the Court's anticipation that other targets would be charged by the government as a result of Mr. Long's cooperation:

> Ms. Rivera Miranda:     He has not, Your Honor.
>
> The Court:              Have any of the physicians been charged?
>
> Ms. Rivera Miranda:     No, Your Honor. And Dr. 2 is deceased[1].
>
> The Court: Okay.        Thank you.

Id., at p. 39. At the conclusion of Mr. Long's second sentencing hearing, the Court ultimately imposed a sentence of 180 months imprisonment. [Dkts. 65, 66].

### B.   Summary of Substantial Assistance Provided by Mr. Long

11.   It is incontrovertible that Mr. Long provided substantial assistance to the government. In fact, Mr. Long began cooperating immediately after law enforcement approached him in this case. On June 14, 2013, the Drug Enforcement Administration [hereinafter "DEA"] executed two search warrants – one at the Professional Pain Center and the other at Mr. Long's residence. According to a DEA report produced by the government in discovery, on this same date, June 14, 2013, Mr. Long was interviewed by DEA agents for the first time. At the beginning of this interview, Mr. Long waived his Miranda warnings and agreed to speak to investigators without legal representation. Thereafter, Mr. Long provided the agents with a comprehensive overview of the activities the government was investigating at the Professional Pain Center.

12.   In sum and substance, Mr. Long stated the following to agents: Mr. Long and Daniel Bogan started the Professional Pain Center together in 2010. Although Mr. Long provided the initial seed money for the business, Daniel Bogan provided the actual knowledge of how to run a pain clinic. In fact, Daniel Bogan told Mr. Long that he (Bogan) knew several patients who would come to the clinic immediately. The first medical doctor [hereinafter "Doctor #1"] hired to work

---

[1] Dr. 2 as described by the government at this sentencing hearing is actually the medial doctor referred to in the instant motion as Doctor #1.

at the Professional Pain Center was referred to the clinic by a physician recruiter whom Mr. Long and Daniel Bogan found on Craigslist. After several months, the physician recruiter helped Mr. Long and Daniel Bogan recruit a second medical doctor [hereinafter "Doctor #2"] to work at the clinic. The physicians saw approximately 40 to 50 patients per day. The proceeds from the clinic were divided amongst some of the targets of the government's investigation as follows: (a) Mr. Long was paid $10,000.00 to $12,000.00 per week; (b) Daniel Bogan was paid $10,000.00 per week; and (c) Doctor #2 was paid $9,000.00 per week. With regard to the amount of pills prescribed to patients, Doctor #1 told Mr. Long that he (Doctor #1) was the doctor and that he would make the decisions with regard to the pills. This arrangement ensured that it was the doctors at the pain clinic, and not Mr. Long, who were deciding how and when to overprescribe the controlled substances. Mr. Long further admitted that some of the proceeds from the clinic were used to purchase a sports bar in Palm Bay, Florida, and new homes.

   13. In addition to providing the above-detailed information, Mr. Long admitted to the interviewing agents that two cash envelopes seized from his vehicle were proceeds from the Professional Pain Center, which Mr. Long planned to deposit into a bank account. In sum, Mr. Long acknowledged his involvement in the overall conspiracy and provided useful and actionable information to the government, including incriminating information regarding two of the medical doctors who were overprescribing harmful controlled substances at the clinic. At the time that Mr. Long began his cooperation in June 2013, he was among the first individuals in this conspiracy to cooperate. Moreover, he was in a unique position to provide detailed information to the government about the inner-workings of the Professional Pain Center, including the activities and roles of the most culpable members of the conspiracy.

14. Following his initial interview with the DEA, Mr. Long attended a total of four proffers with the government, which took place on August 9, 2013, February 6, 2014, October 14, 2016, and September 5, 2017, respectively. An AUSA or agents from the DEA were present for each of these proffers, as were attorneys from the undersigned's law firm. At his first two proffers, which occurred before his guilty plea, Mr. Long provided the government with a complete and full disclosure of everything he knew about the conspiracy, including useful information concerning Daniel Bogan, Doctor #1, and Doctor #2. For instance, Mr. Long informed the government that it was Daniel Bogan who had approached him about opening up a pain clinic. Further, Mr. Long stated that Daniel Bogan placed an advertisement on Craigslist looking for a doctor they could use at the pain clinic. Mr. Long further stated that Daniel Bogan helped to deposit illegal proceeds from the clinic into bank accounts. Mr. Long also informed the government that in addition to illegally prescribing controlled substances, Doctor #2 engaged in unethical behavior at the clinic, including having sexual encounters with some of his patients. Moreover, Mr. Long provided information with regard to another co-conspirator, who worked as a security guard at the clinic and stole a prescription pad from Doctor #2. Thereafter, this co-conspirator used the prescription pad to procure a controlled substance prescription from a Walgreens pharmacy. Mr. Long also identified several photographs of the targets in the government's investigation. Lastly, Mr. Long admitted to the government that he used tainted proceeds from the clinic to purchase an ownership stake in a sports bar, and for the purchase of several real properties in Central Florida.

15. After his guilty plea, Mr. Long continued his cooperation with the government. In fact, within days of his guilty plea, Mr. Long resumed his cooperation efforts by attending another proffer with a DEA agent on October 14, 2016. At this proffer, Mr. Long provided detailed information about an interstate marijuana trafficking ring that was shipping pounds of marijuana

to Orlando from Nevada and California. Mr. Long gave the DEA the name, date of birth, and a description of a local individual who was receiving these shipments of marijuana. It remains unclear what became of the information that Mr. Long provided concerning this marijuana trafficking conspiracy.

16. Following his final sentencing on February 2, 2017, Mr. Long continued providing substantial assistance to the government. On September 5, 2017, the government held a proffer with Mr. Long at the Coleman Federal Correctional Institution. At this proffer, Mr. Long once again provided a thorough overview of the criminal activities that occurred at the Professional Pain Center, including detailed and actionable information on Daniel Bogan, Doctor #2, and a number of other potential co-conspirators. In addition, Mr. Long informed the government about an individual who caused two overdose deaths, including one in Palm Bay, Florida, in the Middle District of Florida. Mr. Long provided a description of the house where the Palm Bay overdose occurred, as well as the name of another individual who could identify the person responsible for causing the overdose death. All of the forgoing information from Mr. Long was provided to the government, either through the undersigned or during Mr. Long's proffer on September 5, 2017.

17. Mr. Long's information to the government was both truthful and reliable. In fact, it appears that the government relied on this information during its investigation. For instance, the government included some of the information and details provided by Mr. Long in a DEA PowerPoint presentation, dated January 23, 2017, which summarized the findings of the government's investigation. Presumably this PowerPoint presentation was provided to law enforcement officials and/or prosecutors during a briefing on the status of the investigation. In addition, information wholly consistent with Mr. Long's proffer statements was furnished to the Court during Mr. Long's sentencing. For instance, at the February 2, 2017 hearing, DEA Task

Force Officer Keith Whitmore testified for the government, and confirmed that Daniel Bogan recruited Mr. Long into the conspiracy:

> Q:   Okay. So you said that Long and Bogan were traveling to South Florida to buy prescription pills. What happened thereafter?
>
> A:   After that, **Bogan approached the defendant and to start a new venture in opening a pain clinic. They initially wanted -- Bogan placed on ad on craigslist and was contacted by a consulting firm**. That consulting firm then provided them the name of Dr. 2. They met with Dr. 2. Dr. 2 was the driving force for the Longwood location.

[Dkt. 90, at pp. 19-20] (emphasis added). Eventually, Officer Whitmore also confirmed that Daniel Bogan ran the day-to-day operations at the Professional Pain Center:

> Q:   . . . The issue is, who was there day to day after the changeover?
>
> A:   The majority of the time it was Bogan towards the end.

Id., at p. 27.

18.   Mr. Long's admissions to the government with regard to the assets he purchased using the proceeds from the Professional Pain Center also proved extremely useful to the government. The very same assets that Mr. Long identified in his proffers were eventually forfeited by the government. [Dkt. 3 at ¶ 12].

19.   Beyond the information noted above, which clearly advanced the government's investigation, Mr. Long also provided information that assisted the government in appropriately exculpating at least one medical doctor who was under investigation at the Professional Pain Center. This particular physician was not a bad actor and should not have been targeted by the government. At one of his proffers, Mr. Long candidly informed the government that this doctor was in fact a "professional individual." Mr. Long's information as it relates to this medical doctor's behavior is

in stark contrast to the conduct of Doctor #1 and Doctor #2. As noted below, such exculpatory information can constitute substantial assistance to the government, because it assists the government in the exercise of its most important function, i.e., to do justice and exculpate the innocent where appropriate.

20. Throughout his cooperation, Mr. Long looked forward to the day when he would be called by the government to testify against his co-conspirators, either in the grand jury or at trial. Through no fault of his own, that opportunity never arose and Mr. Long was not called by the government to testify. However, for several months following Mr. Long's last proffer, the government continually led the undersigned to believe that Mr. Long's cooperation would still be used by the government to prosecute Daniel Bogan. Finally, on June 29, 2018, at a meeting at the U.S. Attorney's Office, the assigned prosecutor informed the undersigned that the investigation into the Professional Pain Center was closed, because the criminal activity under investigation had become too old to prosecute under the statute of limitations.

21. At the June 29, 2018 meeting, the prosecutor further advised the undersigned that a plea agreement for Daniel Bogan had been prepared and that Daniel Bogan was set to plead guilty to a general conspiracy, under 18 U.S.C. § 371. According to the prosecutor, Mr. Long's proffer information had been conveyed to the original defense attorney for Daniel Bogan in an effort to leverage a guilty plea from Daniel Bogan. Ultimately, the government's plea negotiations with Daniel Bogan reached an impasse and the government decided not to pursue an indictment against him within the statute of limitations. In sum, the government confirmed that Mr. Long's information, which was actionable at the time that he provided it to the government, related to events that are now too old to be prosecuted.

### III. MEMORANDUM OF LAW

When the government agrees to file a motion for a reduction of a sentence in the event that the defendant renders substantial assistance, a defendant may file a motion to compel specific performance of the plea agreement provisions if the government in bad faith refuses to file the motion[2]. See e.g. United States v. Huerta, 878 F. 2d 89, 94 (2d Cir. 1989); see also United States v. Fernandez, 127 F. 3d 277, 285–86 (2d Cir. 1997); United States v. Brechner, 99 F. 3d 96, 99 (2d Cir. 1996); United States v. Leonard, 50 F. 3d 1152, 1157 (2d Cir. 1995). Moreover, plea agreements, such as the one at issue here, are construed according to contract law. See, e.g., United States v. Pollack, 91 F. 3d 331, 334 (2d Cir. 1996) (plea agreements are construed according to contract law); United States v. Knights, 968 F. 2d 1483, 1486 (2d Cir. 1992) ("specific performance may also be available when the government breaches a plea agreement containing a cooperation clause"); and United States v. Khan, 920 F. 2d 1100, 1105 (2d Cir. 1990) ("cooperation agreements, like plea bargains, may usefully be interpreted with principles borrowed from the law of contract"), cert. denied, 499 U.S. 969 (1991).

Admittedly, the government has broad discretion in deciding whether to make a substantial assistance motion, but that discretion is subject to judicial review "if it is based on an unconstitutional motive, such as the defendant's race or religion, or **is not rationally related to any legitimate government end**." United States v. Bryant, 738 Fed. Appx. 652, 653 (11th Cir. 2018) (citing Wade v. United States, 504 U.S. 181, 185-86 (1992)) (emphasis added); see also United States v. McNeese, 547 F. 3d 1307, 1309 (11th Cir. 2008) (extending Wade to Rule 35(b) motions).

---

[2] However, in United States v. Forney, an Eleventh Circuit panel noted in dicta that judicial review only was appropriate to review allegations of unconstitutional motivations and that mere allegations of bad faith were insufficient to warrant review. 9 F. 3d 1492, 1501-02 & n. 5 (11th Cir. 1993).

"[T]he scope of the government's discretion [does not] permit it to ignore or renege on contractual commitments to defendants." United States v. Rexach, 896 F. 2d 710, 714(2nd Cir. 1990) (citations omitted); see also Khan, 920 F. 2d at 1105. Nor does the government's discretion encompass the power "to ignore a defendant's cooperation efforts simply because the defendant is supplying information that the government does not want to hear," Khan, 920 F. 2d at 1105 (citation omitted), or "because the government ultimately loses its case . . . ." Knights, 968 F. 2d at 1488. Moreover, the government may not rely on circumstances of which it was aware at the time of the execution of the cooperation agreement as a reason for failing to issue a substantial assistance motion. Knights, 968 F. 2d at 1487; see also United States v. Harpaul, 4 F. Supp. 2d 137, 143 (E.D. N.Y. 1998). This is so because if the government was aware of such information prior to the execution of the cooperation agreement, and entered into the agreement anyway, the government assumed the inherent risk that the defendants' aid in the investigation may prove futile. Id.

Indeed, there are occasions where courts must conduct a "more searching review" of the government's decision not to file a substantial assistance motion. Even defendants who have no cooperation agreements are entitled to assurance that the government's motion is not withheld for some unconstitutional reason. See Wade, 504 U.S. at 185-86; Leonard, 50 F. 3d at 1157. Moreover, those defendants, such as Mr. Long, who have made an agreement with the government are entitled to a " 'more searching' review." See Brechner, 99 F. 3d at 99 (citing United States v. Kaye, 65 F. 3d 240, 243 (2d Cir. 1995) (quoting Leonard, 50 F. 3d at 1157)). In such cases, courts look to see "if the government has lived up to its end of the bargain."[3] Knights, 968 F. 2d at 1486 (2d Cir. 1992). Courts will also inquire as to whether the government acted fairly and in good faith. United

---

[3] In Forney, the Eleventh Circuit questioned, in a footnote, the process described in Knight for determining bad faith in the government's refusal to file 5K1.1 motions. 9 F. 3d at 1503 & n. 4.

States v. Resto, 74 F. 3d 22, 26 (2d Cir. 1996). "In sum, a district court has jurisdiction to consider a motion to compel . . . where there is an allegation and substantial showing that the government's refusal to file a 'substantial assistance' motion is not 'rationally related to any legitimate [g]overnment end.'" United States v. Stamboulides, 147 Fed. Appx. 65, 67 (11th Cir. 2005).[4]

Mr. Long has clearly demonstrated that he in fact provided substantial assistance to the government. As noted above, Mr. Long attended multiple meetings with the government and provided credible and reliable information that substantially assisted in investigating and prosecuting other persons. These meetings continued to occur within one year of his sentencing, as his last meeting with the government took place on September 5, 2017. Mr. Long was never told by the government at any of these meetings that his information was not helpful or that the government did not intend to use his information. Instead of informing Mr. Long and the Court of the possibility that the government might never prosecute the remainder of the targets in its investigation, the government continued to behave as though they planned to prosecute Daniel Bogan and possibly other individuals, based on Mr. Long's information. In fact, the assigned prosecutor confirmed to the undersigned at the above-described June 29, 2018 meeting that Mr. Long's information would have been used to prosecute Daniel Bogan had Bogan been timely prosecuted by information. In sum, Mr. Long was deserving of a substantial assistance, and, but for the government's failure to timely prosecute Mr. Long's co-conspirators, he likely would have already received such a motion.

---

[4] Neither the Eleventh Circuit nor the Supreme Court has ever directly addressed precisely "when the government's decision not to file a Rule 35 motion would not be rationally related to legitimate government ends." See Bryant, 738 Fed. Appx. 654.

In addition to the foregoing, Mr. Long aided the government in doing justice in this investigation, in that, his information helped to exculpate at least one individual who should not have been categorized as a target. In <u>Harpaul</u>, the defendants' cooperation did not lead to the arrest, indictment, or prosecution of others, however, their assistance to the government yielded, <u>inter alia</u>, information that a suspect was acting in compliance with the law. F. Supp. 2d at 142-143. The United States took the position in <u>Harpaul</u> that the defendants' cooperation did not render substantial assistance to the government. <u>Id.</u> at 142. In response, the defendants filed a motion seeking specific performance by the government of their cooperation agreements. <u>Id.</u> at 140. In finding that the government's representations were insufficient to show that they acted in good faith in refusing to grant the defendants' substantial assistance motion, the Court noted the following:

> The role of the United States Attorney is not only to prosecute offenders, but to act in the interest of justice to exculpate innocent persons. **<u>In this Court's view, if the defendants' cooperation resulted in the discovery of exculpatory rather than incriminatory information, the Government may not refuse to acknowledge the defendants' assistance because the fruits of their cooperation ultimately results in no prosecution.</u>**

<u>Id.</u> at 143 (emphasis added). Thus, at least one district court has found that truthful exculpatory information, similar to the information provided by Mr. Long concerning the aforementioned doctor, could be considered substantial assistance to the U.S. Attorney's Office, given the unique role that prosecutors play in the criminal justice system.

Mr. Long can also point to specific facts showing that the government's decision not to file a substantial assistance motion was not rationally related to legitimate government ends. As set forth above, Daniel Bogan was equally responsible for the conspiracy at the Professional Pain Center. In addition, Daniel Bogan was arguably more culpable than Mr. Long because Mr. Long

stopped going to the clinic in approximately late 2010 or early 2011. In contrast, Daniel Bogan continued to run the day-to-day operations at the clinic until the DEA executed their search warrant there. Daniel Bogan's statements to law enforcement confirm that he played a more significant role at the Professional Pain Center. A DEA report dated June 18, 2013, states that Daniel Bogan told the DEA that Mr. Long had not had "too much to do with the business anymore," and that running the day-to-day operations of the business was easier without Mr. Long around. Another DEA report dated October 4, 2013, states that Daniel Bogan advised the DEA that around the beginning of 2011, Mr. Long stopped coming to the clinic. In sum, Mr. Long and Mr. Bogan were equal participants in this conspiracy, they both provided similar cooperation, and Mr. Long provided earlier, more crucial cooperation; yet they received drastically different treatment from the government. Mr. Long received a significant federal prison sentence, while Daniel Bogan was not prosecuted at all.

In addition to not prosecuting Daniel Bogan, the government also failed to use Mr. Long's information to prosecute Doctor #2, who was responsible for illegally prescribing a significant amount of harmful controlled substances to patients. Despite his illegal and unethical behavior, as revealed in the government's investigation, Doctor #2 remains an active and licensed medical doctor in the State of Florida. Thus, Doctor #2 continues to treat patients to this very day.

It is indisputable that the government's decisions as it relates to Mr. Long and his co-conspirators was not rationally related to any legitimate government goal. Quite the opposite, the government's interest in protecting the public and deterring criminal wrongdoing were clearly undermined by their failure to prosecute the other individuals who were primarily responsible for the harm caused at the Professional Pain Center. In addition, Mr. Long provided information about an individual who caused an overdose death in Palm Bay. It remains unclear whether the

government actually pursued the overdose investigation, but one thing is clear, Mr. Long never received any credit for disclosing this information.

Refusing to recognize Mr. Long's significant cooperation is not rationally related to legitimate government interests, despite the fact that the government failed to successfully prosecute Daniel Bogan and Mr. Long's other co-conspirators. The outcome here is analogous to when a cooperator testifies for the government at a trial that the government ultimately loses. Like the cooperation in that situation, Mr. Long did everything within his control to assist the government. As noted above, the government's decision not to file a substantial assistance motion should not be made simply "because the government ultimately loses its case against [a] co-defendant." Knights, 968 F. 2d at 1488. Similarly, here, the government's decision not to recognize Mr. Long's cooperation should not be based on the fact that the government's prosecution of Mr. Long's co-conspirators was unsuccessful, especially since this was due to the government's own failure to timely charge and prosecute the other individuals.

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935), overruled on other grounds by Stirone v. United States, 361 U.S. 212 (1960). The government's post-sentencing refusal to file a substantial assistance motion on Mr. Long's behalf has produced an extremely disproportionate outcome in this case, especially when compared to Mr. Long's equally, if not more culpable, co-conspirators who received no punishment at all. Such a disparate result cannot be rationally related to the government's most important function, to ensure justice in every case.

Furthermore, as the Court is well-aware, the use of cooperating defendants is imperative to effective law enforcement and to the mission of federal prosecutors throughout the country. The government's decision not to recognize Mr. Long's cooperation actually undermines these legitimate government interests and could have a chilling effect on other cooperators in long-term or complex investigations. The message that Mr. Long's case sends is that defendants should not cooperate with the U.S. Attorney's Office early in a complex investigation because such cooperation will ultimately go unrewarded due to an investigation becoming too old to prosecute. Perversely, the outcome here actually discourages cooperation and incentivizes defendants to wait it out and avoid accepting responsibility in the hopes that the government's investigation will eventually go away. This approach certainly benefitted Daniel Bogan and Doctor #2, who will never see the inside of a courtroom or prison, despite their serious criminal conduct in this case.

Mr. Long remains entitled to relief under Rule 35, despite the fact that it has been more than one year since his sentencing. Rule 35 of the Federal Rules of Criminal Procedure provides that:

> Upon the government's motion made more than one year after sentencing, the court may reduce a sentence if the defendant's substantial assistance [in investigating or prosecuting another person] involved ... information provided by the defendant to the government within one year of sentencing, but which did not become useful to the government until more than one year after sentencing.

Fed. R. Crim. P. 35(b)(2)(B).

In United States v. Thelomat, 186 F. Supp. 3d 1293 (M.D. Ala. 2016), a district court addressed subpart (b)(2)(B) of Rule 35 in the context of a timing scenario similar to the one at issue here. The Rule 35 motion in Thelomat was filed beyond one year of the defendant's sentencing, however, the motion suggested that "some or all of Thelomat's information was useful within one

year of sentencing." 186 F. Supp. 3d 1295. The <u>Thelomat</u> court construed subpart (b)(2)(B) of Rule 35 liberally and found that "so long as some of the provided information became useful or was used in some way after one year," the substantial assistance motion could be granted. <u>Id.</u> at 1295-96. The district court based its decision on the following reality of defendant cooperation:

> . . . how and when cooperation and information occur and how and when they play out as useful cannot often be neatly placed on each of two sides of a moment in time—indeed, more often then not they cannot be separated at all.

<u>Id.</u> at 1296. Notably, the court also stated:

> . . . the thrust of subpart (b)(2)(B) is to allow the government to afford relief to those defendants who provide information within a year of sentencing **but who have no control over when the government will use the information or deem it useful**.

<u>Id.</u> (emphasis added).

In <u>United States v. Duarte–Penaloza</u>, 202 F. Supp. 2d 1370, 1371–72 (N.D. Ga. 2002), another case that addressed the filing of a Rule 35 motion beyond one year of the defendant's sentencing, the district court for the Northern District of Georgia granted <u>nunc pro tunc</u> relief and allowed the motion to be filed late. The <u>Duarte–Penaloza</u> court reasoned that "Rule 35(b)'s inflexible limitations period must be applied in a manner that is consistent with the Due Process Clause of the United States Constitution." <u>Id.</u> at 1372. Ultimately, the court permitted the filing of the Rule 35 motion <u>nunc pro tunc</u> to a date when it would have been timely, in the interest of "judicial economy and efficiency," because doing so enabled the government to avoid a breach of the plea agreement with the defendant, and a possible violation of the defendant's due process rights. <u>Id.</u>, at 1372. Here, Mr. Long is merely seeking to have his cooperation recognized in some

way.[5] Based on the holdings of Thelomat and Duarte–Penaloza, the Court should construe subpart (b)(2)(B) of Rule 35 liberally, and direct the government to file the substantial assistance motion, beyond one year after Mr. Long's sentencing.

### III.   CONCLUSION

WHEREFORE, the defendant, James Long, respectfully requests that this Court grant the instant motion and enter an Order directing the government to file a motion, pursuant to Federal Rule of Criminal Procedure 35(b)(2), recognizing Mr. Long's substantial assistance to the government, and hold an evidentiary hearing to address the issues raised herein.

Respectfully submitted this 20th day of May, 2019.

| | |
|---|---|
| /s/ Andrew C. Searle | /s/ A. Brian Phillips |
| **ANDREW C. SEARLE, ESQ.** | **A. BRIAN PHILLIPS, ESQ.** |
| Florida Bar No.: 0116461 | Florida Bar No.: 0067113 |
| **A. BRIAN PHILLIPS, P.A.** | **A. BRIAN PHILLIPS, P.A.** |
| 912 Highland Avenue | 912 Highland Avenue |
| Orlando, Florida 32803 | Orlando, Florida 32803 |
| Telephone:    (407) 872-0777 | Telephone:    (407) 872-0777 |
| Telecopier:    (407) 872-0704 | Telecopier:    (407) 872-0704 |
| Andrew.Searle@phillips-law-firm.com | Brian.Phillips@phillips-law-firm.com |

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY on May 20, 2019, I filed a copy of the foregoing with the Clerk of the Court via the CM/ECF system. I further certify that all parties to this case are equipped to receive service of documents via that system.

s/ A. Brian Phillips
A. Brian Phillips, Esq.

---

[5] It is also important to note for the Court that Mr. Long is not idly wasting his time in federal prison. Instead, he is bettering himself by taking full advantage of the resources and programs available to him in the Bureau of Prisons. Most recently, Mr. Long completed a six month Certified Horticulture Professional program offered through the University of Florida. Mr. Long has a background in lawncare and landscaping, and hopes to use the skills he acquired through this program upon his release from federal prison.