FILED

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

2020 AUG 10  PM 2:40

UNITED STATES OF AMERICA

    Plaintiff,

v.                                          Case No. 6:16-CR-180-RBD-GJK

James Long

    Defendant,

_____ /

**EMERGENCY MOTION TO REDUCE SENTENCE OR FOR COMPASSIONATE RELEASE**
**PURSUANT TO 18 U.S.C. § 3582 (c)(1)(A)**
**AND**
**REQUEST FOR EXPEDITED BRIEFING SCHEDULE**

    Defendant, James Long, respectfully requests that this Honorable
Court reduce his sentence to time served, pursuant to 18 U.S.C.
§3582(c)(1)(A), in light of the following:

    1.  Mr. Long has satisfied the prerequisite to filing this motion in
light of the lapse of 30 days from when the Warden of FCI Coleman-LOW, where
Mr. Long is incarcerated, received his request that the Bureau of Prisons
(BOP) file a motion for compassionate release on his behalf.

    2.  The extraordinary and compelling circumstances described warrant
granting this motion for compassionate release. To the extent that any of
these circumstances are disputed, Mr. Long requests an evidentiary hearing.

    3.  The factors set forth in 18 U.S.C. § 3553(a) further support
granting Mr. Long compassionate release.

    4.  Mr. Long is not a danger to the safety of another person or his
community, as provided in 18 U.S.C. § 3142(g).

5.   Mr. Long has a solid relapse plan in place.

**MEMORANDUM**

Until December 21, 2018, the Court's authority to reduce a sentence under 18 U.S.C. § 3582(c)(1)(A) was severely circumscribed as it depended on a motion by the BOP. As 18 U.S..C. § 3582(c)(1)(A) (2017)  The BOP, however mismanaged and underutilized the compassionate release program, according to the Department of Justice's Office of Inspector General.

To "increas[e] the use and transparence of compassionate release," Congress amended § 3582(c)(1)(A) in the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, § 603 (Dec. 21, 2018).  As amended,the statute now authorizes courts to reduce a sentence upon the defendant's motion, provided the defendant first asks the BOP to move for compassionate release on his behalf. See 18 U.S.C. § 3582(c)(1)(A)(2020).  Mr. Long thus moves this Court to grant him compassionate release and reduce his sentence to time served, or home confinement.

**I.   Administrative Process**

Section 3582(c)(1)(A) authorizes courts to grant compassionate release and resentence an inmate simply "upon motion of defendant," after "the defendant has fully exhausted all administrative rights to appeal" the BOP's failure to file a motion, **or** once 30 days have lapsed from the warden's receipt of request, "whichever is earlier."  81 U.S.C. § 3582(c)(1)(A).

On July 06 , 2020¦ the warden of FCI Coleman-LOW, where Mr. Long is confined, received Mr. Long's request that the BOP file a compassionate-release motion on his behalf.  More than 30 days have lapsed since then.  Mr. Long is thus entitled to bring this motion directly to the Court pursuant to § 3582(c)(1)(A).

Mr. Long filed his request through the Trulinc's email system which inmates are allowed to use to send correspondence to various BOP departments. At least one other court has decided that the email system, which provides a "date/time stamp", is an appropriate path to "submi[t] to the warden" his/her request. In **United States v. Head**, No. 2:08-CV-0093-KLM-2 (E.D. Ca 2020), the court determined that **Head's** email was a request to the warden for compassionate release. See **(Ex.1)**.

## II. Extraordinary and compelling Circumstances

Section 3582(c)(1)(A) authorizes the Court to reduce a sentence if it finds that "extraordinary and compelling reasons warrant such a reduction" and that the "reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" See 18 U.S.C. § 3582(c)(1)(A). Congress did not define "extraordinary and compelling reasons." Instead, Congress directed the U.S. Sentencing Commission to expound upon what constitutes such reasons.

### Extraordinary and Compelling Reasons

Congress has expressly intended to ensure that federal district courts had the authority and power to prevent inequity and injustice whenever extraordinary and compelling reasons exist to do so. However, Congress did not define the terms "extraordinary" and "compelling". Congress left that task to the United States Sentencing Commission. First, for the Commission to provide definitions by example, and then more precise meaning. **United States v. Spears**, 2019 U.S. Dist. LEXIS 177991 (D. Ore. 2019). A task that the effectively defunct Commission did not complete. That truncated process requires us to turn to existing jurisprudence for a definition. **Id.**

### Extraordinary

American post-conviction jurisprudence has long recognized that unintended consequences and unforeseen events generate extraordinary

circumstances requiring exceptional procedures (i.e., exceptions to general rules) in order to avoid unwanted and unjust results. See e.g., **United States v. Morgan**, 346 U.S. 502 (1954)(coram nobis); **Murry v. Carrier**, 477 U.S. 478 (1986)(equitable exception); **United States v. Peter**, 310 F.3d 709 (11th Cir. 2002)(coram nobis).

From our survey of both Supreme Court jurisprudence, and the district court's interpretation of the First Step Act's amendment of § 3582(c)(1)(A), we conclude that the boundary of the extraordinary encompasses events either beyond the control of both defendant and the court, or beyond the foreseeability of the sentencing court, or a combination of both. And as always those also including circumstances where an actually innocent individual has been imprisoned.

Finally, on occasion, extraordinary may mean unique or odd, but usually it involves when an "external obstacle" beyond a person's control "stood in [its] way" of a fair opportunity to be heard. **Menominee Indian Tribe v. United States**, 136 S. Ct. 750, 756 (2016)(describing extraordinary in the equitable tolling context). An extraordinary circumstance is one that impedes a claimant's opportunity to have the merits of his request decided.

### Compelling

Separately, compelling means not only emotionally unfair, but also disparate treatment of similarly-situated individuals. See, e.g., **Dell v. United States**, 710 F.3d 1267 (11th Cir. 2019)(Martin J. concurring)("We cannot explain to the public or Mr. Dell's family why the rules prevent him but not his more culpable co-defendant from returning home sooner."); **Martin v. Franklin Capital Corp.**, 546 U.S. 132, 139 (2005)(an example of compelling is a violation of a "basic principal of justice [such as] like cases should be decided alike.").

Currently, we believe that there are four rare scenarios that occur frequently enough to be identified as extraordinary and compelling:

1.  When ordinary prison conditions have a substantial adverse effect on a prisoner's health,

2.  sentence which the law required a court to impose, Congress has subsequently determined as inherently unjust,

3.  the classic extraordinary circumstance is a miscarriage of justice there an actually innocent individual has been imprisoned, and

4.  then a substantial change in the socio-economic environment or an Act of God requires a reassessment of the costs of imprisonment and a reevaluation of the punishment in relation to the four primary penological purposes.

The hallmarks of these circumstances: events beyond the control of individual seeking relief, and either harsher than the anticipated punishment, or, punishment that is fundamentally different than what others experience for the same misconduct.

The Sentencing Commission thus created the policy statement set forth in U.S.S.C. § 1B1.13, which provides the following considerations: (A) the defendant's medical condition (including terminal illness and other serious conditions and impairments); (B) the defendant's age; (C) the defendant's family circumstances: and (D) "other reasons." U.S.S.G. § 1B1.13, comment n.1(A)-(D).

The fourth catagory---"other reasons"--- makes clear that extraordinary and compelling reasons may exist even when a defendant is not elderly, ill, of facing complicated family circumstances. See U.S.S.G. § 1B1.13, comment. n.1(D)("As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivision (A) through (C).").

In regards to U.S.S.G. § 1B1.13. (C)-(D), the defendant's family circumstances; and other reasons:

Another factor in Mr. Long's submitted request for compassionate release on home confinement is so that he can help support his wife and two children ages 7 and 9.

Mr. Long's wife is currently struggling with health issues, developed stomach ulcers and depression since Mr. Long has left. Mr. Long's wife has also been in the hospital numerous times due to her illness and has lost over 50lbs which is mostly related to severe stress. Mr. Long's son has also developed an ulcer, also related to stress, from missing his father. Mr. Long was, and wants to be again, the provider for his family. Currently his wife has no one to watch his children. It is Mr. Long's hope that if he is released to home confinement that he will be able once again help support his family and provide for their upkeep, as well as help with their home schooled education due to the coronavirus. Mr. Long would attend to their needs while his wife is at work. Mr. Long is worried about his wife's immune system that she won't be able to fight off the COVID-19 virus which she may contract between work and home, possibly passing it on to his children. His son has asthma. Mr. Long's wife's father is living out of state and her mother has passed. It is Mr. Longs prayer to be released to home confinement where he will once again be able to provide for his family.

The Sentencing commission has not amended this policy statement since Congress revised § 3582(c)(1)(A). Thus, to the extent this policy statement gives the BOP the authority to determine when "other reasons" might warrant compassionate release, it is irreconcilable with the statute, which permits a defendant to bring a § 3582(c)(1)(A) motion to the Court even when the BOP expressly decides that no reasons warrant compassionate release. That aspect of the commentary, therefore, is not binding on the Court because it is inconsistent with the text and undisputed purpose of the First Step Act. Moreover, it is not binding given the guidelines are advisory only. see **United States v. Booker**, 543 U.S. 220 (2005).

Indeed, by amending § 3582(c)(1)(A). Congress empowered courts to make this critical determination, even absent any determination by the BOP or despite a BOP determination that a defendant's case is not extraordinary or compelling. As explained by the district court in **United States v. Cantu**,

> [T]he correct interpretation of § 3582(c)(1)(A)--based on the text, statutory history and structure, and consideration of Congress's ability to override any of the Commission's policy statements 'at any time'....--- it is when a defendant brings a motion for sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in the U.S.S.G. § 1B1.13 cmt. n.1(A) to (C) warrant granting relief.

**United States v. Cantu**, 423 F.Supp.3d 345, 352 (S.D. Tex 2019).

This Court may therefore make an independent assessment of whether Mr. Long's circumstances present extraordinary and compelling reasons that warrant the reduction of his sentence. Indeed, this Court "is in a unique position to determine whether the circumstances warrant reduction (and, if so, the amount of reduction)[.]" U.S.S.G. § 1B1.13, comment. N.4 Accordingly, Mr. Long respectfully submits that reason below, individually and in combination, are extraordinary and compelling, warranting a time served

sentence. Those reasons include, but are not limited to Mr. Long's vulnerability to death or serious injury from the COVID-19 pandemic, in light of his confinement in prison and physical health conditions.

**Mr. Long is exceptionally vulnerable to death or serious injury from the coronavirus in light of his confinement, and health issues.**

The current COVID-19 pandemic pose grave danger to this country's population. And it is even more dangerous for Mr. Long because of his physical health issues---particularly his respiratory issues, Pneumoconioses, obstructive airway disorder, skin cancer, and heart disease---make Mr. Long particularly at risk of death or serious injyry from COVID-19.

**1. COVID-19 and Prison**

That people in environments with confined spaces---where people live, eat, and sleep in close proximity---face increased danger of contracting COVID-19 is already painfully clear from the experience in nursing homes. Prisons have unique dangers even as compared to other confined environments. As one court recently observed: "Prisons are tinderboxes for infectious disease. The question whether the government can protect inmates from COVID-19 is being reexamined every day as outbreaks continue to emerge and new testing efforts reveal that the rate of infection in many correctional facilities is far higher than previously imagined." **United States v. Pablon,** 2020 WL 2112265, at \*2 (E.D. Pa. May 4, 2020).

Joseph J, Amon, an infectious disease epidemiologist and Director of Global Health and Clinical Professor in the Department of Community Health and Prevention at the Drerxel Dornsife School of Public Health, has studied infectious diseases in detention settings and states:

> Detention facilities have even greater risk of infectious disease spread because of the conditions of crowding, the proportion of vulnerable people detained, and other scant medical care. People who live in close quarters are also subject to security measures

which prohibit successful 'social distancing' that is needed to effectively prevent the spread of COVID-19. Toilets, sinks and showers are shared, without disinfection between use. Food preparation and food service is communal. with little opportunity for surface disinfection. The crowded conditions, in both sleeping areas and social areas, and the shared objects (bathroom, sinks, etc.) will facilitate transmission. Some jails an prisons have already become COVID-19 hot spots. For instance, the infection rate in New Your City jails is far outpacing the infection rate in the City as a whole. FCI-Oakdale, a BOP facility in Louisiana, recently "exploded with coronavirus" cases, leading to death of several inmates and positive tests for many.

Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 in prisons. According to the CDC, correctional facilities "present[] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors" because many detention conditions create a heightened risk of danger to detainees, including: low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and the limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing).

The measures necessary to protect oneself from COVID-19---such as social distancing and frequent hand washing---are nearly impossible in a prison setting. There is also a concern that the BOP will not be able to provide the ventilators and other specialized medical care that will be needed as more and more inmates get seriously ill from the virus. As a result, the preventative and emergency medical care that vulnerable defendants like Mr. Long may need cannot reliably be obtained while they remain incarcerated. See 18 U.S.C. § 3553(a)(2)(D)(direction the courts to consider "most effective manner" to provide medical care when fashioning sentence). Mr. Long's medical needs are therefore better met at home with his family, where he can practice

social distancing and personal hygiene and where, if he gets sick, he can access the care he needs through local health care providers, directly and without delay.

## 2. Health Conditions and COVID-19

Federal prisons are significantly overcrowded and under-resourced. See, e.g., **Testimony of Bureau of Prisons Director Kathleen Hawk-Sawyer before the United States Senate** (November 2019); **United States Sentencing Commission Report on Compassionate Release** (2016). By further example, on any given day for most of the day, the Federal Prison Complex in Coleman, Florida has no M.D. or D.O. medical personnel on duty. To exacerbate this problem, even the paramedical personnel are not present for a significant portion of the time.

Making matters worse, medical treatment of prisoners leaves much to be desired. A prisoner will be "black-boxed" during transport to a hospital, and will be chained to the hospital bed. Once there, he will receive treatment that restrict his movements to the point of trauma, and treatment that aggravates the immune systems that are needed to combat a COVID infection. These are particularly onerous limitations in the current environment, given the constant vomiting and diarrhea that accompanies full-blown COVID-19. Furthermore, in the best of times, communications between the prison health system and the medical providers is notoriously substandard — (i.e., regular mis-routing of prisoner-patients, under-prescribing of drugs, prescribing incompatible or incorrect medicines, etc.) — making inconsistent treatment common.

All of which make more poignant the statements of the Attorney General and a host of other officials. For example, on March 23, 2020, a bipartisan group of 14 United States Senators urged the state DOC's, as well as the federal Bureau of Prisons, "to take the necessary step" to protect the

"most vulnerable" inmates.   On March 13, 2020, President Trump noted, in declaring a state of emergency, that the First Step Act empowers the BOP to help the prisoners most at risk from the virus.

These concerns provided the impetus for Attorney General Barr to issue a directive to the BOP to more aggressively use home confinement and compassionate release to alleviate the current crisis. **Operations Memorandum** (March 26, 2020).   And presumably to protectively improve future conditions in order to avoid aggravating the current crisis further and preventing a future crisis. **Id.**

### 3. The COVID-19 Pandemic

As of this filing, the United States leads the world in confirmed cases of COVID-19, with over 3000000 and a death toll of 150000.   The total numbers of confirmed cases is unknown, however, due to limited testing resources and a large number of asymptomatic cases.

The World Health Organization and the CDC have warned that certain people are at higher risk of developing serious, potentially fatal, illness from COVID-19, specifically older people and "people of all ages with undrlying medical conditions, particularly if not well controlled", including people with **serious health issues, respiratory problems, heart conditions, and hypertension.**   A recent study found that 56.6% of patients hospitalized with COVID-19 have hypertension.   COVID-19 has been found to cause acute respiratory syndrome,and other dangerous respiratory conditions.   Even in non-terminal cases.   Experts warn that COVID-19 can cause extensive and permanent damage to the lungs.

### Federal Rules of Evidence 201(b)(2)

Mr. Long respectfully requests this Court take judicial notice of the Bureau of Prisons' (BOP) website. bop.gov.   See **FRE 201(b)(2)**.   The BOP's

website purports to report the total number of actual COVID-19 cases currently at FCC-Coleman-(Low) where Mr. Long redides.[1]  Because the BOP's website's "accuracy cannot reasonably be questioned," **FRE 201(b)(2)**, and "[a]bsent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports[,]" **Dimanche v. Brown**, 783 F.3d 1204, 1213 n.1 (11th Cir. 2015)(citing **Terrebonne v. Blackburn**, 646 F.2d 997, 1000 n.4 (5th Cir. 1981)).  Mr. Long requests this Court take judicial notice of the BOP's website.

### 4. COVID-19 and Physical Illness

Mr. Long's medical records confirm that Mr. Long suffers from Pneumoconiosis: a riolin pneumoconiosis from breathing concrete dust for over 25 years, Obstructive Airway disorder. a form of occupational asthma caused by concrete dust from operating a concrete saw and lime from the mortar mix as well as pollin from cutting grass for over 15 years.  Mr. Long also suffers from Heart mitrial valve prolapse causing chest pain, dyspenea, and fatigue. Mr. Long also has a BMI "Body Mass Index" of over 31.16, was diagnosed with a bipolar disorder, skin cancer, and recently had a skin graph on his face in November 2019, and also has valvular heart disease with mitro valve prolapse and mitrial regurgitation.  These conditions, according to the CDC, put Mr. Long at a serious risk in light of the COVID-19 pandemic.  Please see https://cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (stating that those at "high risk for severe illness from COVID-19 include people of all ages with underlying medical conditions such as heart

---

[1].     Disturbingly, Florida has reported record breaking numbers in positive COVID-19 cases, and "the COVID-19 case rate for prisoners was 5.5 times higher than the U.S. population case rate." **Journal of the American Medical Association, COVID-19 Cases and Deaths in Federal and State Prisons——Brendan Sabner, Ph.D., et al.** (July 8, 2020) However. FCC-Coleman has not administered COVID-19 tests to the majority of its inmates.

disease, hypertension, obesity, and respiratory issues).

Compounding the danger that Mr. Long already faces with his medical condition is the fact that individuals in custody face a heightened risk of contracting COVID-19 and other contagious diseases.  The CDC has identified several of the reasons why prisons and jails are especially vulerable to the transmission of COVID-19 within their cell walls, such as housing the inmates in confined spaces, the "daily staff ingress and egress," the transfer if inmates between facilities, limited cleaning supplies, and conditions of confinement that do not allow inmates "to exercise disease prevention measures." Additionally FCI Coleman-LOW where Mr. Long resides, Black Mold is all throughout the air system.  Black mold spores are discharged into the air constantly. There men suffer from what they call the "Coleman Crud" a respiratory reaction to black mold spores.  The shower room ceiling which is severely peeling is about to fall down and possibly kill someone and the area above it where the pipes, beams and access doors are covered with it.  The CDC has specifically advised that people of any age with moderate to severe asthma who contract COVID-19 "are at a higher risk for severe illness."  Such individuals risk "getting very sick from COVID-19," because the virus "can effect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease.  Since there is no known treatment for COVID-19 at this time, the CDC recommends that the only way "to prevent illness is to avoid being exposed to this virus."

The CDC recommends that people in Mr. Longs condition take very simple everyday precautions: keep space between oneself and others; keep away from those who are sick; clean hands often by washing with soap and water or using an alcohol-based hand sanitizer; avoid crowds; sharing personal items such as cups and towels; clean and disinfect high touch surfaces; open windows

and doors and use a fan that blows air outdoors; and stay at home as much as possible to further reduce the risk of being exposed.  Although all of these self-protective mechanisms would be possible if Mr. Long were immediately released from institutional confinement, none of them are possible---and Mr. Long will be placed at a significant risk---if he remains incarcerated.

## III. Consideration of § 3553(a) Factors Support Granting this Motion

The Court considered the § 3553(a) factors in sentencing Mr. Long for violating 18 U.S.C. § 1956(h), Conspiracy to commit money laundering.  The overreaching purpose of our judicial system is to replace private justice with public justice; concommitantly, there is an objection for public compassion to replace private mercy.  An aspiration that infuses 18 U.S.C. § 3553(a)'s requirements that the court create an individualized punishment that is sufficient, but not greater, than necessary 18 U.S.C. § 3553 (so -called parsimony clause).

Section 3582(c)(1)(A) provides that this court must conduct the extraordinary and compelling analysis within the framework of "the factors set forth in [18 U.S.C. §] 3553(a) ..." 18 U.S.C. 3582(c)(1)(A).  In that regard, this Court should balance the provisions of the parsimony principle with the four traditional provisional objectives set forth in §3553(a):

1) retributive but just punishment;

2) deterrence effect;

3) protection of the public; and

4) rehabilitation.

Mr. Long has been incarcerated since he was 44 years old.  He is now 48.  With gain time, he has done 68 months of his 180 month sentence..  According to the BOP, his presumptive release date is December 24, 2029, at which time Mr. Long will be 57 years old.

In the age of COVID-19. "sufficient but not greater than necessary" takes on new meaning and particular significance for vulnerable "at risk" inmates like Mr. Long. That is, "[t]o avoid a sentence that was sufficient but not greater than necessary from becoming one immeasurably greater than necessary," the compassionate release of vulnerable inmates is appropriate. See **United States v. Park**, 2020 WL 1970603 at *5 (S.D.N.Y. Apr 24, 2020)(internal citations omitted); accord **United States v. mel**, 2020 WL 2041674 at *3 (D. Md Apr 28, 2020)(finding release appropriate where "the actual severity of the sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing.").

## IV. Releasing Mr. Long Will Pose No Safety Concerns.

Mr. Long is not a danger to his community. He has no history of violence. His release is consistent with the factors under 18 U.S.C. § 3553(a).

Under § 3582(c)(1)(A) and § 1B1.13, which is advisory only, the Court must find that Mr. Long is not a danger to his community as defined under 18 U.S.C. § 3142(g) and that the sentence modification is consistent with the factors in § 3553(a):

1) the offense history and characteristics of the defendant;

2) to reflect the seriousness of the offense and promote respect for the law, and to provide just punishment;

3) to afford adequate deterrence to criminal conduct;

4) to provide the defendant with educational training, medical care, or other correctional treatment.

Mr. Long was charged with violating 18 U.S.C. § 1956(h) Conspiracy to commit money laundering, which is not a violent crime. Mr. Long has a

mental health score of CARE-MH1, and a PATTERN score of MEN.  In Mr. Long's case he will be returning home to his wife Brandy and their two children at 1780 Atz Road, an Malabar, Florida 32950.

The Court can rest assured that Mr. Long poses no danger to his community.  Mr. Long has never been involved in any violent conduct.

The § 3553(a) factors also weigh in favor of releasing Mr. Long to home confinement, as he is the quintessential low-level offender who is unlikely to reoffend.

Allowing Mr. Long to serve the remainder of his sentence under home confinement is reasonable based on his valuable cooperation with the government, the need to avoid unwarranted sentencing disparities, and the history and characteristics of Mr. Long, who has strong support from his wife and family and has otherwise been an upstanding citizen and family man.

Mr. Long is currrently waiting this Court's ruling on his § 2255 and requests that if his § 2255 motion is granted that he be placed on home confinement.  A court's decision whether to release or detain a § 2255 petitioner pending the outcome of an appeal is guided by F.R.Cv.P. Rule 23(c). **Hilton v. Braunskill**, 481 U.S. 770, 772 (1987); **United States v. Mell**, 41 F.3d. 1281, 1282 (9th Cir. 1995), stating that petitioner should apply to the district court for release pending appeal. Mr. Long believes that this motion would also serve as that application as well.

**V. Release Plan**

To ensure Mr. Long continues his rehabilitation, gets the medical treatment that he needs, and complies with his conditions of supervised release, Mr. Long's wife and family are prepared to do whatever is necessary that will protect Mr. Long's health and allow him to return to his community as a productive citizen.  Upon release he will quarantine in Malabar, Florida

with his wife and children. Mr. Long will seek medical treatmentfor his medical condition as well as anything else ordered by this Court. After quarantine, and with the Court's permission, Mr. Long would like to return to work where he is regarded as being "an honest and upstanding co-worker."

### Conclusion

As explained above, this Court has the authority to grant Mr. Long's compassionate release to home confinement. Mr. Long respectfully submits exercising that authority to reduce his sentence to time served would serve the interests of justice. He therefore moves this Honorable Court to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A). In the event the government disputes any of Mr. Long's claims in support of this motion, an eveidentiary hearing is requested.

Respectfully submitted this 6th day of Avg , 2020.

_____
Mr. James T. Long #68246-018
FCI Coleman - LOW
P.O. Box 1031   Unit B-1
Coleman, Florida 33521-1031
Proceeding, Pro se

## VERIFICATION

Under penalty of perjury, pursuant to 28 U.S.C. § 1746, I declare that the factual allegations contained herein are true and correct to the best of my knowledge.

Mr. James T. Long #68216-018

## CERTIFICATE OF SERVICE

This motion was delivered in a pre-addressed, postage-paid envelope to the prison mailing authorities on the same day as signed. All parties to this case including the United States of America are registered with the CM/EFC docketing system, therefore Petitioner is requesting that notification regarding this motion occur through that system's electronic medium.

Mr. James T. Long #68216-018
Federal Correctional Complex - LOW
P.O. Box 1031   Unit B-1
Coleman, Florida 33521-1031
Proceeding, Pro se